474

Francisco Ballester Ripoll, peticionario, *v.* Tribunal de Apelación de Contribuciones, etc., demandado; Rafael A. Buscaglia, Tesorero de Puerto Rico, interventor.

Núm. 1495.—*Sometido:* Febrero 1, 1943. *Resuelto:* Marzo 9, 1943.

*J. J. Ortiz Alibrán,* abogado del peticionario; *Hon. Procurador General Interino M. Rodríguez Ramos y Eulogio Riera, Procurador Auxiliar,* abogados del interventor.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

Este caso se encuentra ante nos por segunda vez. En una ocasión anterior fué visto mediante un auto de *certiorari* expedido contra el Tribunal de Apelación de Contribuciones en relación con cuestiones de jurisdicción y procedimiento. 60 D.P.R. 768. Ahora está ante nos para una decisión en sus méritos a virtud de un segundo auto de certiorari.

El 15 de marzo de 1941 el peticionario y su esposa radicaron planillas separadas de contribución sobre ingresos correspondientes al año 1940. Cada uno de ellos declaró un ingreso neto de $19,529.45 y pagó una contribución de aproximadamente $450 de manera que juntos declararon $39,058.90 y pagaron contribuciones ascendentes en total a $908.78. Cada uno declaró como ingreso separado la mitad del ingreso recibido de las mismas fuentes; o sea, (1) sueldo de una sociedad, dietas como director de una sociedad y dietas como director de una corporación, todos estos servicios pres-

tados, presumiblemente, por el esposo solamente, y (2) intereses sobre pagarés adeudados por una sociedad, beneficios de una sociedad, y dividendos de corporaciones.

El 18 de agosto de 1941 el Tesorero "reliquidó" la planilla del peticionario, de conformidad con las Leyes núms. 31 y 159, Leyes de Puerto Rico, 1941 ((1) págs. 479 y 973), consolidándola con la de su esposa y eliminando ciertas exenciones y créditos. A tono con su actuación, el Tesorero notificó al peticionario que tendría que pagar, sobre el ingreso neto combinado ascendente a $39,058.90, una contribución adicional de $5,661.71, haciendo un total de $6,570.49 para el año 1940. Expedimos un auto de *certiorari* para revisar la decisión del Tribunal de Apelación de Contribuciones sosteniendo esta actuación del Tesorero.

El requerir de esposo y esposa que sometan una sola planilla de contribución sobre ingresos es una cuestión que ha sido objeto de aguda controversia. Organizaciones feministas en los Estados Unidos continentales, señalando el hecho de que hoy día las mujeres votan, trabajan, ocupan cargos y ayudan a librar una guerra, han protestado vigorosamente contra los intentos para obtener legislación federal requiriendo mandatoriamente una planilla conjunta (*mandatory joint return*) de esposo y esposa bajo la ley federal de contribución sobre ingresos. La conceptúan como una medida retrógrada que atenta contra los derechos de las mujeres como individuos y un retorno a la vieja doctrina de la ley común que ha sido gradualmente descartada en muchos otros campos del derecho, al efecto de que el esposo y la esposa son uno, y ese uno el marido. Algunas organizaciones se han opuesto a la medida como una cuestión de alto principio, afirmando que ella discrimina contra la decencia e invita a la inmoralidad.

Aquellos que han luchado para que se inserte esta disposición en las leyes federales de rentas internas alegan que ella nada tiene que ver en una discusión sobre la emancipación de la mujer. Afirman que es simplemente el producto de la realidad económica de que "La distribución artificial de gran-

des ingresos entre diversas personas es una de las maneras más obvias de evadir contribuciones" Bruton, *The Taxation of Family Income,* 41 Yale L. J. 1172, y que sólo trae como consecuencia "una relación entre el concepto legal y las realidades económicas de disfrute o goce". (*Burnett* v. *Wells,* 289 U. S. 670, 77). Al implementar tal argumento, Paul nos ofrece ilustraciones de los discrímenes que se alega resultan de una disposición bajo la ley federal al tiempo en que escribió su obra, que permite planillas separadas de esposo y esposa, provenientes de estados donde existe la sociedad de gananciales. "Un residente de Nueva York, por ejemplo, con un sueldo de $100,000 paga $32,525 como contribución federal, mientras que un californiano con exactamente el mismo sueldo puede hacer que su esposa declare la mitad, de manera que la contribución federal *combinada* a ser pagada por los dos sería solamente de $18,626.00. . . . Los rumores de que las virtudes del estado matrimonial se recomiendan grandemente entre los tan anunciados residentes de Hollywood por razones distintas al vendaval de emociones incontrolables, puede que no sean enteramente infundados." (Paul, *Studies in Federal Taxation, 2nd Series,* nota 94, págs. 41, 42).

Hasta la fecha el esfuerzo determinado para obtener tal legislación federal ha sido resistido con éxito (Mertens, *Law of Federal Income Taxation, Temporary Supplement,* Enero, 1943, pág. 289), aunque sí se ha logrado agrietar parcialmente el bloque de la oposición en cuanto a contribuciones sobre herencia y contribuciones análogas. (Secciones 402, 404, y 453 de la Ley de Rentas de 1942, *The Estate and Gift Tax Amendments: Revenue Act of 1942; Community Property; Comment,* 31 Calif. L. Rev. 61 (Dic. 1942) ). Cualquiera que sea nuestra opinión personal sobre esta cuestión de los convencionalismos actuales (*current mores*), la elección entre estas consideraciones en pugna corresponde a las ramas políticas del gobierno, y no a nosotros. Nos limitamos a decidir las cuestiones legales envueltas en la elección que la Legislatura ha hecho.

La sección 13 de la Ley núm. 31, Leyes de Puerto Rico, 1941 ((1) pág. 479), que enmienda la sección 24(*b*) de la Ley núm. 74, Leyes de Puerto Rico, 1925 (pág. 401), dispone que "Si un esposo y esposa que viven juntos tienen un ingreso neto por el año contributivo de $2,000 o más, o unidos tienen un ingreso bruto durante dicho año contributivo de $5,000 o más, el ingreso total de ambos deberá ser incluído en una sola declaración conjunta, debiendo computarse la contribución normal y adicional sobre el ingreso en conjunto. El ingreso neto o bruto recibido por uno de los cónyuges no podrá ser dividido entre ambos cónyuges." El peticionario alega que el ingreso correspondiente al 1940 declarado separadamente por él y su esposa era, de acuerdo con nuestra ley sobre bienes gananciales, propiedad separada de cada uno de ellos, y que la actuación del Tesorero al consolidar sus planillas de conformidad con la sección 13—dando por resultado el que su ingreso estuviera incluído en un nivel donde el tipo contributivo es más alto—y al requerir contribución adicional de él, lo privó de su propiedad sin el debido procedimiento de ley. Descansa en casos de la Corte Suprema de los Estados Unidos que interpretan la aplicación de la ley de contribución sobre ingresos federal en estados donde rige la sociedad de gananciales, y en el caso de *Casals* v. *Sancho Bonet, Tes.,* 53 D.P.R. 640.

El Tribunal Supremo de los Estados Unidos, al confrontarse en ciertos estados con el problema de acoplar la institución de la sociedad de gananciales del derecho civil dentro del armazón de un estatuto federal de contribución sobre ingresos redactado principalmente a la luz de los principios de la ley común, adoptó lo que pareció en el momento una fórmula pragmática—la ley estatal sobre bienes gananciales determinaría si el interés de una esposa en el ingreso en cuestión era tal que le diera derecho bajo las disposiciones específicas de la ley de contribución sobre ingresos federal a radicar una planilla separada.

En cuatro opiniones consecutivas empezando con la de *Poe* v. *Seaborn,* 282 U. S. 101, y terminando a la página 132 en el mismo volumen, el Tribunal Supremo resolvió que si, de conformidad con la ley estatal en un estado donde existe la sociedad de gananciales, una esposa tenía un derecho adquirido actual, en el ingreso ganancial, y "no una mera expectación o esperanza durante el matrimonio" (*Bender* v. *Pfaff,* 282 U. S. 127, 31), se le consideraría, a los fines de la contribución federal sobre ingresos, como la dueña de una mitad de tal ingreso, y por consiguiente tenía derecho bajo los términos de la ley federal a radicar una planilla separada de la de su esposo, declarando como su ingreso separado una mitad del ingreso ganancial.

Es importante tomar nota de que *Poe* v. *Seaborn* y los casos que lo acompañan se basaron en el hecho de que el Tribunal fué llamado a interpretar el lenguaje específico de la ley federal que imponía contribuciones sobre "el ingreso neto de cada individuo." La Corte indica a la página 109 que "La Ley no va más allá y no proporciona ningún otro 'standard' o definición de lo que constituye el ingreso de un individuo. El uso de la palabra 'de' significa propiedad". El resultado a que se llegó se limitó simplemente a resolver que, una vez que se llega a la conclusión bajo la ley sobre bienes gananciales de un estado específico que el derecho de la esposa en el ingreso ganancial es uno adquirido, "los esposos tienen derecho a radicar planillas separadas reputando cada uno la mitad del ingreso ganancial como ingreso de cada uno 'de' ellos como un 'individuo' tal como se usan esas palabras en las secciones 210(*a*) y 211(*a*) de la Ley de Rentas de 1926". (*Bender* v. *Pfaff,* supra, a la página 132). Por tanto no estaba envuelta cuestión alguna sobre el derecho del Gobierno Federal a imponer contribución sobre tal ingreso, si así lo hubiera querido, mediante el uso de un lenguaje más específico con el fin de exigir que el esposo y la esposa radicaran una planilla conjunta, o del derecho de un estado a así

disponerlo en su ley de contribución sobre ingresos a pesar de su propia regla sobre bienes gananciales.

El esfuerzo para determinar la naturaleza del interés de la esposa en los bienes gananciales ha producido un fecundo caudal de discusión legal, que "ha avivado la llama de controversia jurídica durante muchos años." (*Arnett v. Reade,* 220 U. S. 311, 19). "Los abogados, como otros profesionales, deben trabajar con categorías. No es extraño, por tanto, que la sociedad de gananciales haya sido comparada con una sociedad, un fideicomiso, *an estate by the entirety, an inchoate dower right, and an heir's expectancy.* Se ha admitido francamente que el interés de la esposa es *sui generis,* desafiando los principios (*criteria*) de la ley común. Como una puerta de escape de sus dificultades cuando se confrontaron con algo que era extraño con su manera de pensar, los abogados y los jueces, entrenados a la luz de la terminología de la ley común, se ampararon en los conceptos de 'derecho adquirido' y de 'expectación', con el fin de poder discutir o analizar los derechos de propiedad de la esposa. *En la mayoría de los casos muy poco hubiera importado que se utilizara uno u otro de estos dos conceptos con el fin de describir el interés de la esposa."* (Bastardillas nuestras). Paul, *Federal, Estate and Gift Taxation,* Vol. I, pág. 56.

En verdad, California vió el punto inmediatamente. Aunque "muy poco hubiere importado que se utilizara uno u otro de estos dos conceptos con el fin de describir el interés de la esposa"—hasta donde tenemos conocimiento, no hubo cambio substancial alguno en lo que concierne el derecho sustantivo de propiedad—cuando el Tribunal Supremo negó a las esposas residentes en California el privilegio de radicar planillas separadas de contribución federal sobre ingresos declarando la mitad del ingreso ganancial como su ingreso separado, por el fundamento de que, bajo la ley sobre bienes gananciales tal como había sido entonces interpretada por las cortes de California, el interés de la esposa era una mera ex-

pectación o esperanza (*United States* v. *Robbins,* 269 U. S. 315, 27), California inmediatamente aprobó un estatuto calificando el interés de la esposa como adquirido, y la Corte Suprema, a la luz de este nuevo estatuto, con igual prontitud concedió a los esposos de California el privilegio de rendir planillas separadas en las cuales se dividía entre ellos el ingreso de la sociedad de gananciales. (*United States* v. *Malcolm,* 282 U. S. 792).

El criterio determinante parecería por tanto ser sencillamente una cuestión de nomenclatura. Su aplicación raras veces afecta substancialmente los derechos de propiedad de los esposos. De admitirse que es decisivo en la determinación de un problema tan importante y enteramente práctico en el campo de la contribución sobre ingresos, constituiría la delicia de aquellos que consagran el conceptualismo. Sin embargo, estamos constreñidos por la decisión en *Poe* v. *Seaborn* a determinar cómo resultará afectado el gobierno en esta jurisdicción de acuerdo con tal criterio.

Al resolver que los bienes gananciales responden de una sentencia sobre un pagaré otorgado por el marido como un coprincipal de favor (*accommodation comaker*) esta Corte dijo en *National City Bank* v. *De La Torre,* 54 D.P.R. 233, a las páginas 236, 7:

". . . Pero es que la de gananciales es una sociedad *sui generis* distinta de las demás sociedades. En ella el marido es un administrador con poderes tan amplios y absolutos que con razón se afirma que en sus relaciones con terceros la sociedad y el marido son la misma entidad, existiendo la diferencia solamente en las relaciones de los esposos *inter se.* La posición de la mujer es puramente pasiva: . . . En otras palabras, el interés de la esposa en la sociedad conyugal mientras ésta subsiste *es una mera expectación* o esperanza de participar en la mitad del activo líquido que pueda resultar luego de liquidada la sociedad. . . ." (Bastardillas nuestras).

La Corte de Circuito de Apelaciones confirmó esta sentencia (110 F. (2d) 976; cert. denegado, 311 U. S. 666), aunque dió a entender en una extensa opinión del Juez Magru-

der que lo hacía así sólo porque la sentencia de esta Corte sobre esta cuestión de ley local no era "inescapablemente errónea" (110 F. (2d), a la pág. 983).

Al resolver la moción de reconsideración en el caso de *De la Torre,* esta Corte dijo que "no dudamos que en realidad el interés de la espsoa es algo más que una mera esperanza . . ." (54 D.P.R. 685, 89). En este caso no estamos considerando la naturaleza de los derechos de la esposa como una cuestión de derecho real en situaciones específicas. No es por tanto necesario, tratándose de un caso contributivo de esta índole, que vayamos más allá de decir que la esposa, durante el matrimonio, no tiene un derecho adquirido. Será preferible dejar para una futura ocasión el decidir exactamente cuán cerca está su derecho, en situaciones específicas, de ser un derecho adquirido. El decir que "el interés de la esposa es algo más que una mera esperanza", no quiere decir que se considere el interés de la esposa como uno adquirido, y ésa es la única cuestión que está ahora ante nos. Véase *Ramos González & Co.* v. *Registrador,* 41 D.P.R. 58, 61; McKay *on Community Property* (1925 ed.), Secciones 835–40, págs. 561–63.

En vista de estas consideraciones, no vemos cómo pueda el peticionario escapar a la doctrina sentada en *United States* v. *Robbins,* 269 U. S. 315, al efecto de que el ingreso obtenido por el esposo o producido por los bienes pertenecientes a la sociedad de gananciales no puede ser declarado, a los efectos de la contribución federal sobre ingresos, rindiendo cada uno una planilla por la mitad de dicho ingreso. A esta conclusión se llegó en 1918 en las Islas Filipinas en una opinión del Juez Sr. Malcolm. *Madrigal y Paterno* v. *Rafferty,* 38 Jur. Fil. 414. Y "La Tesorería ha decidido . . . . que ciudadanos de Estados Unidos residentes en Cuba, Islas Vírgenes y España, no pueden dividir los ingresos percibidos, toda vez que en esas jurisdicciones el interés de la esposa en los bienes de la sociedad de gananciales no es ad-

quirido." Ray, *Proposed Changes in Federal Taxation of Community Property: Income Tax,* 30 Calif. L. Rev. 397, 402 (1942).

El peticionario sostiene que en *Casals v. Sancho Bonet, Tes.,* 53 D.P.R. 640, se llegó a un resultado contrario. Pero en dicho caso esta Corte estaba obligada por el lenguaje específico de la sección 24(*b*) (1) de la Ley de Contribuciones sobre Ingresos tal como fué originalmente redactada en 1925, la cual permitía al esposo y a la esposa rendir planillas separadas. Esa sección, como hemos visto, ha sido modificada en el sentido de exigir una sola planilla conjunta por ingresos en exceso de determinada cantidad. El problema se reduce, por tanto, a determinar la validez de la legislación enmendatoria.

El Juez Sr. Holmes, con su acostumbrada perspicacia, señaló en el caso de *Robbins* que la alegada inconstitucionalidad de una disposición exigiendo una sola planilla obligatoria de esposo y esposa depende de consideraciones más fundamentales que las descripciones imprecisas de "derecho adquirido" o "expectación". Además de reconocer que en aquella época el interés de una esposa en la propiedad ganancial en California era una mera esperanza, el Juez Holmes dijo, a las págs. 327, 8:

". . . Aun si estamos equivocados en cuanto a la ley de California y asumimos que la esposa tenía un interés en el ingreso de la sociedad de gananciales sobre el cual el Congreso pudo haber impuesto contribución de haberlo deseado, ello no implicaría que el Congreso no hubiera podido imponerle contribución al esposo por el total. Aunque limitado en cuanto a donaciones, etc., solamente él puede disponer de los bienes. . . . Nos parece que el hecho de que a él pueda imponérsele contribución sobre tales bienes no requiere argumentación alguna. Ésta y otras consideraciones llevan a la conclusión de que la intención fué imponerle contribución por el total. Porque no solamente quien tiene todos los poderes debe sobrellevar el peso, . . . [sino que] . . . el esposo [es] el blanco más apropiado para la flecha. . ."

Fué por lo tanto sorprendente que el Juez Holmes concurriese en *Poe* v. *Seaborn* sin levantar su voz de protesta contra la tácita desaprobación en ese caso del fundamento adicional que acabamos de indicar para la decisión en el de *Robbins*. Pero el Juez Holmes volvió a usar este criterio (*test*) en su opinión disidente en *Hoeper* v. *Tax Comm'n of Wisconsin*, 284 U. S. 206. Este último caso resolvió que una ley de Wisconsin sobre contribuciones de ingresos, que disponía una imposición al esposo de contribuciones computadas sobre el total combinado de sus ingresos y los de su esposa, aumentados por contribuciones adicionales provenientes de dicha combinación, *aunque bajo las leyes del estado él no tenía interés en o control alguno sobre los bienes o el ingreso de su esposa,* violaba el debido procedimiento, toda vez que constituía un "intento del estado de calcular la contribución sobre los bienes o ingresos de una persona, haciendo referencia a bienes o ingresos de otra" (pág. 215), esto es, estaba "Imponiendo contribución a una persona por la propiedad de otra . . . . " (pág. 218). La opinión disidente del Juez Sr. Holmes, en la cual concurrieron los Jueces Brandeis y Stone, dice en parte, a las págs. 219, 20, como sigue:

"No puede disponerse de este caso como que constituye un intento de privar a una persona de su propiedad con el fin de pagar las deudas de otra. Las leyes son el resultado de mil años de historia. Deben considerarse a la luz de las antiguas reglas al efecto de que marido y mujer son uno, y ese uno el esposo; y que así como el marido se hizo cargo de la propiedad mueble de la esposa, de igual manera respondía de las deudas de ella. Constituyen una unidad con ecos de diferentes instantes, ninguno de los cuales puede imperar sobre el otro. El énfasis dado en otras secciones a la separación de intereses no puede hacernos sordos a la presunción, contenida en las secciones citadas, de gananciales cuando dos esposos viven juntos y cuando corrientemente cada uno de ellos recibirá el beneficio del ingreso del otro sin inquirir sobre su procedencia. En tanto en cuanto concierne a la Constitución de los Estados Unidos, la legislatura tiene poder para determinar cuáles han de ser las consecuencias del matrimonio, y como puede disponer que el

marido tendrá o no tendrá ciertos derechos en los bienes de su esposa, y será o no será responsable por las deudas de ésta, puede asimismo disponer que será responsable por contribuciones sobre un ingreso que con toda probabilidad hará su vida más cómoda y le ayudará a pagar sus cuentas. Al imponerse contribuciones podrá considerarse no solamente el control, sino el disfrute en sí de la propiedad sujeta a contribución.

"Agregaré algunas palabras que me parecen superfluas. Se dice que Wisconsin ha eliminado las antiguas características del estado matrimonial. Pero ha manifestado expresamente que conserva ésta. Y cuando la legislatura claramente indica que se propone lograr cierto resultado que está dentro de su poder realizar, es nuestro deber proveer cualquier fórmula que la *elegantia juris* parezca necesitar. *Sexton* v. *Kessler & Co.*, 225 U. S. 90, 97.''

El peticionario vigorosamente sostiene que la opinión de la mayoría en *Hoeper* v. *Tax Commission* se interpone en nuestro camino en este caso. Recientemente nos enfrascamos en un proceso algo laborioso con el fin de distinguir una opinión de la Corte Suprema de los Estados Unidos sobre contribuciones que fué revocada poco tiempo después. (Compárese *Piacentini* v. *Buscaglia, Tesorero,* 59 D.P.R. 767, 774, con *State Tax Comm'n* v. *Aldrich,* 316 U. S. 174). Si tal proceso ha de repetirse en la actual situación no compete a nosotros decirlo. Comentaristas imparciales de reconocida reputación han expresado sus puntos de vista a ese efecto. Paul, *Studies in Federal Taxation, Second Series,* pág. 40 *et seq.; Third Series,* pág. 178, nota 4; Paul, *Federal Estate and Gift Taxation,* pág. 62; Lowndes, *Community Income and Alimonies, Taxes,* Vol. 20, núm. 1, pág. 3 (Enero, 1942). "La tendencia de las recientes decisiones de la Corte Suprema es a prescindir de los refinamientos de título y a imponer contribución sobre el ingreso a la persona que lo controla y deriva de él beneficio real. En vista del hecho de que bajo la ley de los varios estados en que rige la comunidad de bienes al marido se le otorga el manejo y control de los bienes de la sociedad de gananciales, no es improbable que la Corte Suprema resolviera que él responde de las con-

tribuciones impuestas sobre todo el ingreso ganancial, revocando de hecho la doctrina de *Hoeper* v. *Wisconsin,* supra.'' 3 Mertens, *Law of Federal Income Taxation,* pág. 7 (1942).

Los casos recientes ciertamente han dado cada vez más claras señales de aviso de que el razonamiento de la opinión de la minoría en *Hoeper* v. *Wisconsin,* más bien que el de la opinión de la mayoría, predomina actualmente. En verdad, puede afirmarse categóricamente que la Corte Suprema en los últimos años ha abandonado grandemente, en otras situaciones, la prueba de propiedad técnica adoptada por la Corte en *Poe* v. *Seaborn.*

Aquellos que respaldan la causa de *Poe* v. *Seaborn* descansan en la aplicación mecánica de la lógica, usando como la principal premisa de su silogismo la regla de derecho de que no puede imponerse la contribución de A sobre la propiedad de B, y aplicándola a los hechos aquí alegados, que A y B, aunque casados entre sí, tienen derechos adquiridos separadamente en sus bienes gananciales. Lejos de desacreditar la lógica, la reconocemos como un instrumento indispensable para las cortes. En verdad, el que hagamos caso omiso de sus métodos en todo momento equivaldría a escoger el sendero de actuaciones arbitrarias. Pero debemos, como ha dicho el Juez Holmes, pensar cosas, no palabras. La ley no es una ''omnipresencia cavilante en el cielo''; su impacto en los hechos de la vida real es constante. ''La vida de la ley no ha sido la lógica; ha sido la experiencia'' (Holmes, *The Common Law,* pág. 1). Y ''una página de historia equivale a un volumen de lógica.'' (El Juez Holmes, en *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 49).

Como se verá dentro de poco, en casos posteriores al de *Poe* v. *Seaborn,* la Corte Suprema de los Estados Unidos se ha liberado a sí misma del rigorismo de la lógica contenida en la absoluta proposición de que está prohibido el imponer contribución a una persona por el ingreso de otra. Esa Corte ha rehusado perderse en un laberinto de lógica, y, si-

guiendo fielmente el principio directivo de que idénticas. circunstancias deben dar lugar a idénticas decisiones, ha desgarrado el velo de la propiedad en su aspecto formal, con el fin de determinar realidades económicas en la intensamente práctica cuestión de imposición de contribuciones. Seguramente nadie se quejará si en este momento el sentido común y la experiencia predominan sobre el silogismo y los concep-. tos doctrinarios.

En una variedad de casos recientes que envolvían donaciones (*Helvering* v. *Horst,* 311 U. S. 112), cesiones (*Lucas* v. *Earl,* 281 U. S. 111; *Helvering* v. *Eubank,* 311 U. S. 122; *Harrison* v. *Shaffner,* 312 U. S. 579), y fideicomisos (*Corliss* v. *Bowers,* 281 U. S. 376; *Burnett* v. *Wells,* 289 U. S. 670; *Helvering* v. *Clifford,* 309 U. S. 331; *Helvering* v. *Stuart,* 317 U. S. ___, 87 L. ed. 109) se alegó sin éxito la contención de que la propiedad legal es el criterio a seguir en la imposición de contribuciones. La Corte Suprema substituyó en su lugar tales fórmulas como la de control económico, solidaridad de la familia como una unidad económica, o aun la "complacencia de sus deseos" (311 U. S. 112, 17), para justificar el resolver que el ingreso de tal propiedad así traspasada continuaba sujeto a contribución en manos del otorgante o cedente a pesar del hecho de que este último se había despojado a sí mismo del título legal sobre tales bienes. El Juez Asociado Douglas dijo en *Helvering* v. *Clifford,* 309 U. S. 331, que el ingreso de un fideicomiso creado por un esposo para beneficio de su esposa era "a lo sumo una redistribución temporal del ingreso dentro de un grupo íntimo de la familia" (pág. 335), y que el fideicomiso no "efectuó ningún cambio substancial en su posición económica." (págs. 335, 6).

A la luz de estos casos, se ha desarrollado la creencia de que no existe ahora barrera constitucional alguna que impida imponer contribución al ingreso total de matrimonios tomados como una unidad, prescindiendo de las cuestiones

del título técnico sobre el mismo. "En vista del número abrumador de autoridades que indican cuál sería el sentir de la Corte Suprema si se presentara a dicho tribunal tal cuestión al presente, no puede haber gran duda en cuanto a la constitucionalidad de una disposición estatutaria que imponga una contribución sobre el ingreso de una familia tomada como una unidad." Ray, *Proposed Changes in Federal Taxation of Community Property; Income Tax*, 30 Calif. L. Rev. 397, 432. Véase Paul, *Selected Studies in Federal Taxation, Second Series*, pág. 41; Paul, *Federal Estate and Gift Taxation*, Vol. 1, págs. 42, 43; Bruton, *The Taxation of Family Income*, 41 Yale L. J. 1172; Lowndes, supra.

De cualquier modo, para decidir el caso ante nos, no necesitamos ir más allá que hacer constar que el de *Hoeper* v. *Wisconsin* ha dejado inalterado el primer fundamento de la decisión en *United States* v. *Robbins*, y que la premisa mayor en que se basa lo resuelto en el caso de *Hoeper*—que el ingreso en cuestión pertenecía en absoluto a la esposa—no existe en nuestro caso como una cuestión de derecho en nuestra ley relativa a bienes gananciales. En verdad, el caso de *Hoeper*, lejos de extender la doctrina del de *Poe* v. *Seaborn*, era sencillamente un caso *a fortiori* de acuerdo con éste, ya que el caso de *Hoeper* surgió en Wisconsin, que es un estado donde no existe la sociedad de gananciales, y el ingreso sobre el que se imponía contribución era más patentemente propiedad de la esposa que en cualquier estado donde existiese dicha sociedad de gananciales, donde ella tendría un llamado "derecho adquirido" en la mitad de tal ingreso.

Al examinar los hechos en nuestro caso en particular, notamos primeramente que, en términos generales, el ingreso es el producto del capital o el trabajo (Sec. 15 de la Ley de Contribuciones sobre Ingresos, tal como fué enmendada por la sec. 7, Ley núm. 31, Leyes de Puerto Rico, 1941). No es necesario que inquiramos en detalle las diferentes fases del sistema de propiedad ganancial tal y como rige en Puerto

Rico (Secs. 1295–1333; Secs. 91–93, Código Civil, ed. 1930) para resolver el presente caso. Sin entrar a discutir posibles excepciones (como un ejemplo posible véanse las secciones 1267–8, Código Civil, ed. 1930; *cf. Quiñones* v. *Corte de Distrito,* 59 D.P.R. 438), en Puerto Rico el ingreso recibido durante el matrimonio, bien sea percibido individualmente o como producto de propiedad privada o ganancial, constituye, en términos generales, un ingreso ganancial. (Sección 1301, párrafos 2 y 3, Código Civil, ed. 1930). Queremos indicar, entre paréntesis, que en el caso de *Casals* no existió desviación de este concepto del ingreso ganancial. Al hablar de "ingreso separado" a la página 647 de dicho caso, esta Corte simplemente se refería al hecho de que la Legislatura había autorizado a la esposa para declarar la mitad del ingreso ganancial en una planilla separada. Ni esa disposición estatutaria ni la actual en cuanto a que debe rendirse una planilla conjunta establecieron regla de propiedad alguna. Cada una de ellas constituía un método de declarar y calcular la contribución y ninguna de ellas aumentó o disminuyó los derechos de propiedad sustantivos de las partes respectivas. En realidad, al exigir una planilla conjunta de esposo y esposa, la legislatura simplemente volvió al concepto tradicional de la propiedad ganancial y eliminó la incongruencia que originalmente resultaba de copiar irreflexivamente el estatuto federal. "La ley que rige la comunidad de bienes está predicada en la unidad de marido y mujer. El permitir planillas separadas está predicado en la separación de marido y mujer." (Altman, *Community Property in Peril,* 19 *Taxes* 262, citado en Paul, *Federal Estate and Gift Taxation,* pág. 62, nota 80).

Debemos dar énfasis al hecho de que no tratamos en esta opinión de sentar reglas detalladas para enmarcar las propiedades e ingresos en que los esposos tengan interés en las categorías respectivas de propiedad ganancial y propiedad privativa. Es suficiente que digamos que nada se ha traído

a nuestra consideración que requiera de nosotros que clasifiquemos de acuerdo con nuestro Código cualesquiera de las partidas que aparecen en las planillas aquí envueltas como otra cosa que no sea ingreso ganancial. Bajo estas circunstancias, disponer que se rinda una planilla conjunta es simplemente conformar nuestra ley de contribuciones sobre ingresos con nuestros tradicionales conceptos de propiedad ganancial. Sólo si existiese una demostración afirmativa de que uno de los esposos ha recibido algún ingreso privativo en el sentido tradicional y técnico, se nos presentaría concretamente el problema de determinar si resta aun alguna validez en *Hoeper* v. *Wisconsin* como autoridad decisiva. No estamos llamados a decidir en este caso si en esa situación podría el gobierno alegar que la disposición de que debe rendirse una planilla conjunta es válida tomando como base el hecho de que podría imponerse contribución a un esposo y esposa que vivan juntos porque constituyen una sola unidad económica.

El resultado final del amplio examen que hemos hecho de esta cuestión es que no vacilamos al resolver que la disposición de la sección 13 de la Ley núm. 31, Leyes de Puerto Rico, 1941, que exige una sola planilla conjunta de esposo y esposa, no es nula en tanto en cuanto se aplica al ingreso declarado por el peticionario y su esposa para el año 1940.

El peticionario alega que los tipos progresivos dispuestos en las secciones 12 y 13 de la Ley de Contribuciones sobre Ingresos violan la disposición de la sección 2 de nuestra Carta Orgánica (Título 48 U.S.C.A. Sec. 737) al efecto de que "Las leyes para la imposición de contribuciones en Puerto Rico serán uniformes." En apoyo de esta contención, el peticionario arguye que la contribución sobre ingresos es una contribución sobre propiedad y es por lo tanto una contribución directa, y cita a *Pollock* v. *Farmers' Loan & Trust Co.*, 158 U. S. 601. La historia de ese caso, y la prestidigitación intelectual necesaria para llegar a ese re-

sultado, se mantienen claras en la mente de los estudiantes de esta materia. Su *ratio decidendi* ha sido descartado. "La teoría, que en una época tuvo abierta aprobación, de que una contribución sobre ingreso es legal o económicamente una contribución sobre el origen, no es sostenible por más tiempo . . ." (*Graves* v. *N. Y. Ex rel. O'Keefe,* 306 U. S. 466, 80). De cualquier modo, esa contención es completamente inmaterial en este caso, toda vez que envuelve un problema peculiar del sistema Federal. Esto es así porque el único requisito constitucional que emana de la conclusión de que una contribución es directa es que la misma será prorrateada de acuerdo con la población (Artículo 1, Sección 9 de la Constitución de Estados Unidos). Pero ese requisito no tiene relación en forma alguna con la legislación insular sobre contribuciones en la que se dispone que las contribuciones serán aplicables en la misma manera en cualquier punto dentro de nuestros límites territoriales. Por tanto, no obtenemos ayuda alguna del esfuerzo realizado para calificar como una **contribución directa** la contribución de ingresos en este caso. Pero aparte de tal cuestión, todavía nos confrontamos con la contención de que la contribución progresiva sobre ingresos está en conflicto con la cláusula sobre uniformidad contenida en el Acta Orgánica.

Al discutir el requisito de la uniformidad que se encuentra en el Artículo 1, Sección 8 de la Constitución de los Estados Unidos, la Corte Suprema señaló en *Steward Machine Co.* v. *Davis,* 301 U. S. 548, que "Si la contribución es una directa, será distribuída de acuerdo con el censo o la computación. *Si constituye un derecho, impuesto o arbitrio, será uniforme en todos los Estados Unidos. Conjuntamente, estos grupos incluyen toda clase de contribución propia de la soberanía."* (Pág. 581; bastardillas nuestras). "De acuerdo con la doctrina ya establecida, la uniformidad requerida es geográfica, no intrínseca." (Pág. 583). "La regla de responsabilidad deberá ser la misma en todos los Estados Uni-

dos'' (*Florida* v. *Mellon*, 273 U. S. 12, 17). Véase *Brushaber* v. *Union Pac. R. R.*, 240 U. S. 1, 25.

Al interpretar un estatuto contributivo insular, nuestra Corte de Circuito de Apelaciones ha dicho que si ''la ley se aplica por igual en todas partes en Puerto Rico, y todos . . . en cada grupo reciben el mismo trato . . . la contribución no está en pugna con la cláusula de uniformidad . . .'' (*San Juan Trading Co.* v. *Sancho*, 114 F. (2d) 969, 72). Como quiera que los estatutos aquí envueltos no disponen diferentes tipos de contribución en distintos sitios dentro de Puerto Rico sino que disponen solamente tipos mayores sobre niveles mayores de ingresos, no hallamos que las secciones 12 y 13 hayan violado la regla de uniformidad contributiva. La mayoría de los casos citados por el peticionario, incluyendo *Domenech* v. *Havemeyer*, 49 F. (2d) 849, 52 (C. C. A. 1*st*., 1931) y *Loíza Sugar Co.* v. *Domenech, Tesorero*, 43 D.P.R. 892, no son aplicables a este problema en particular. Los hemos estudiado cuidadosamente, pero no vemos provecho alguno en extender aun más esta opinión distinguiéndolos en una forma detallada.

█ La sección 15 de la Ley de Contribuciones sobre Ingresos ha dispuesto consistentemente desde 1925 que ''el término 'ingreso bruto' incluye . . . dividendos, beneficios de sociedades . . . '' Pero la sección 18 de la misma hasta recientemente disponía que ''para los fines de la contribución normal solamente se concederán los siguientes créditos: (*a*) Las cantidades recibidas como beneficios de sociedades o como dividendos (1) de una corporación doméstica . . . ''. En su consecuencia, con anterioridad a la aprobación de la Ley núm. 31, Leyes de Puerto Rico, 1941 ((1) pág. 479) los dividendos de una corporación doméstica no les eran tributables personalmente a los accionistas al calcular la contribución normal.

Sin embargo, la sección 10 de la Ley núm. 31, que enmienda la sección 18 de la Ley de Contribuciones sobre In-

gresos, eliminó el crédito arriba citado tanto en los beneficios de sociedades como en los dividendos de corporaciones. Parecería por tanto estar fuera de toda duda, que tal crédito no puede ya deducirse. Pero el peticionario alega que todavía existe a virtud de la disposición de la sección 5 de la Ley núm. 31, que enmienda la sección 12(a) de la Ley de Contribuciones sobre Ingresos, *"Disponiéndose,* que esta contribución normal también *podrá* imponerse y cobrarse sobre el ingreso recibido por accionistas en concepto de dividendos;...".  (Bastardillas nuestras).  Su argumento consiste en que el uso de la palabra "podrá" en esta sección equivale a una intención de otorgar al Tesorero discreción al imponer la contribución en cuestión.  Estamos de acuerdo con el peticionario en que "la Legislatura no puede dejar a la discreción del Tesorero la facultad de imponer una contribución, y . . . un contribuyente no está obligado a pagar si la propia ley no le impone esa obligación."  Pero este nuevo disponiéndose en la sección 12 está de más (*surplusage*).  El eliminar los dividendos de una corporación de la sección de créditos (Sección 18) los hizo tributables sin necesidad de ninguna otra disposición a ese efecto.  Bajo tales circunstancias, la palabra "podrá" empleada en la sección 5 de la Ley núm. 31 obviamente quiso decir "deberá".  "Una palabra no es un cristal, transparente e inmutable, es el ropaje de un pensamiento vivo y puede variar extensamente en color y contenido de acuerdo con las circunstancias y la época en que se use." (*Towne* v. *Eisner,* 245 U. S. 418, 25).  Véanse *Sáenz Cabezón* v. *Tesorero,* 61 D.P.R. 396, decidido el 11 de febrero de 1943; *Pueblo* v. *Avilés,* 54 D.P.R. 272, 79;  Crawford, *Statutory Construction,* párr. 252, pág. 519.

El peticionario alega que es ilegal imponer contribución a un accionista sobre dividendos de corporaciones debido a que la corporación ya ha pagado contribuciones sobre ese mismo ingreso.  Esta contención es frívola.  "No puede ponerse en tela de juicio que el hecho de recibir dividendos de una corporación es un suceso al que puede constitucional-

mente imponerse contribución, con o sin deducciones (se citan casos), aun cuando el ingreso de la corporación, de donde provienen, ya ha sido objeto de una contribución." (*Welch v. Henry*, supra, a las págs. 143, 4). *Wisconsin v. J. C. Penney Co.*, 311 U. S. 435, 42; *Lynch v. Hornby*, 247 U. S. 339; 1 Mertens, supra, Sección 101, pág. 411. Y véase *Hellmich v. Hellman*, 276 U. S. 233. El caso de *United States v. Hudson*, 299 U. S. 498, fué aun más lejos. El Congreso impuso lo que la Corte Suprema decidió era en efecto una contribución especial del 50 por ciento sobre beneficios derivados de traspasos de intereses sobre lingotes de plata. La Corte Suprema, en una opinión emitida por el Juez Van Devanter, dijo a la página 500: "Es inmaterial el que a tal beneficio se le imponga contribución, conjuntamente con otras ganancias, bajo la ley general de contribuciones sobre ingresos, ya que el Congreso tiene poder, de convencerse de que es necesario, para imponer una contribución adicional o mayor."

El peticionario igualmente insiste en que la Ley núm. 31 no contiene disposición alguna para la tributación personal de beneficios de sociedades después de ser éstos distribuídos entre los socios individuales. En este caso su argumento consiste en que en la sección 5 de la Ley núm. 31, que permite la imposición de contribuciones sobre los dividendos de corporaciones, no se hizo mención alguna de beneficios de sociedades. Pero, como hemos visto, todo este disponiéndose está de más (*surplusage*), y debe ignorarse. Sin hacer referencia a la sección 5, es obvio que bajo la sección 10 de la Ley núm. 31 no es ya deducible crédito alguno por beneficios de sociedades, tal como sucede con los dividendos de corporaciones.

El peticionario entonces alega que ya que bajo la sección 28 de la Ley de Contribuciones sobre Ingresos una sociedad paga contribución sobre su ingreso neto, no puede constitucionalmente imponerse a sus socios una contribución sobre el mismo ingreso al serles éste distribuído. Pero la palabra *partnership* no se usa en nuestra Ley de Contribu-

ciones sobre Ingresos en el mismo sentido en que se usa en el derecho común. Es una traducción de la palabra "sociedad" usada en derecho civil. Y una sociedad es una persona jurídica distinta de sus socios. *Puerto Rico* v. *Russell & Co.*, 288 U. S. 476. No existe, pues, objeción constitucional alguna a equiparar, para fines contributivos, a una *sociedad* con una corporación, y a imponer contribución sobre el mismo ingreso tanto a la sociedad como a sus socios individuales. *Fantauzzi et al.* v. *Bonner,* 34 D.P.R. 487, 98. Comparar nuestra situación con la que prevalece al aplicar la Ley Federal de Contribuciones sobre Ingresos a un *partnership* bajo la Ley común—la cual bajo dicha ley no se considera entidad aparte excepto para fines de contabilidad, y por lo tanto no paga contribución como tal—sería invocar una analogía que no existe. Rabkin *and* Johnson, *The Partnership under the Federal Tax Laws,* 55 Harv. L. Rev. 909, 911–14 (1942).

▮ Durante el año 1940 el peticionario era un extranjero residente en Puerto Rico. Él alega que la sección 1 de la Ley núm. 159, Leyes de Puerto Rico, 1941 ((1) pág. 973), al disponer un tipo de contribución más alto sobre el ingreso de un extranjero residente que sobre el ingreso de un ciudadano residente, viola la cláusula de la igual protección de las leyes contenida en la Ley Orgánica.

La clasificación para fines contributivos, desde luego, está permitida. Pero no es suficiente la mera clasificación en sí —no debe ser arbitraria; debe descansar sobre una base razonable (*M. J. y S. Cabrero, Sucrs.* v. *Sancho Bonet, Tes.,* 58 D.P.R. 531, 536). Eso no quiere decir que la regla sea una rígida. "El mero hecho de que la contribución aquí envuelta se impone a base de tipos y deducciones distintos a los que se aplican a otras clases de ingresos no establece la inconstucionalidad. Es elemental que la cláusula de igual protección de las leyes no exige que un estado establezca reglas fijas de contribución uniforme o recurra a distinciones sutiles o establezca una uniformidad científica precisa. Posibles dife-

rencias en la carga contributiva, que no se demuestren que sean sustanciales, o basadas en discrímenes que no se demuestren que sean arbitrarios o caprichosos, no caen dentro de la prohibición constitucional. *Lawrence* v. *State Tax Comm'n,* 286 U. S. 276, 84, 85, y casos citados." (*Welch* v. *Henry,* supra, a la pág. 145). El gobierno alega que, bajo el criterio anteriormente expuesto, la clasificación para la imposición de contribuciones basada únicamente en la extranjería, que tiene por resultado una contribución más alta para extranjeros residentes que para ciudadanos residentes, es una clasificación correcta.

No se puede negar que en muchos casos el *poder de policía* del estado puede ejercitarse para discriminar contra extranjeros. Así, se ha sostenido que un estado puede por medio de legislación al efecto prohibir a los extranjeros (*a*) poseer tierras (*Terrace* v. *Thompson,* 263 U. S. 197), (*b*) obtener empleo en obras públicas (*People* v. *Crane,* 214 N. Y. 154), (*c*) poseer armas de fuego (*Ex parte Rameriz,* 226 P. 914 (Calif.)), (*d*) operar un salón de billar (*Clarke* v. *Deckebach,* 274 U. S. 392), (*e*) cazar (*Patsone* v. *Pennsylvania,* 232 U. S. 138), o (*f*) ejercer la abogacía (*Bosque* v. *United States,* 209 U. S. 91). Pero todos estos casos están predicados en la teoría de que la legislación que así discriminaba contra los extranjeros tenía relación con la protección de la salud, seguridad y moral públicas. En una palabra, las cortes no intervendrán con el criterio legislativo de que el mero hecho de ser ciudadano extranjero era base suficiente para impedir a los extranjeros realizar actividades que, o exigían reglamentación, o envolvían un privilegio que el estado podía elegir conferir o negar. Esta última alternativa fué el fundamento por el cual se sostuvo el derecho del estado a excluir a los extranjeros de trabajar en obras públicas, en el caso de *People* v. *Crane,* 214 N. Y. 154, 108 N. E. 427, auto de error denegado, 239 U. S. 195. Pero el Juez Cardozo, que emitió la opinión de la corte, señala que esto se basa en el hecho de que el gobierno, en su capacidad de propietario,

puede excluir a los extranjeros del derecho a participar de la propiedad que posee en beneficio de sus propios ciudadanos. Entonces enuncia una advertencia en 108 N. E. a la pág. 432, con el siguiente lenguaje:

"Debe ser también evidente que nada de lo contenido en esta opinión da margen para sostener el punto de vista de que el gobierno puede negar a los extranjeros el derecho a dedicarse a cualquier negocio u oficio privado, en igualdad de condiciones que los ciudadanos. . . . Si el oficio es uno que el estado, en el ejercicio de su poder de policía, puede prohibir bien sea absoluta o condicionalmente mediante la imposición de una licencia, el hecho de la extranjería puede justificar una negación del privilegio. . . . Sin embargo en esos casos debe existir alguna relación entre la exclusión del extranjero y la protección del bienestar público. . . . Constituye una negación de la igual protección de las leyes el que el gobierno, en su capacidad de legislador, al regular, no sus propios bienes, sino los negocios privados, impida al extranjero ejercitar su derecho a negociar y trabajar. . . ."

Las palabras de Cardozo emanan de la bien establecida doctrina de que los extranjeros, al igual que los ciudadanos, tienen derecho a la igual protección de las leyes. "Estas disposiciones son universales en cuanto a su aplicación, para todas las personas dentro de la jurisdicción territorial, sin tomar en consideración diferencias de razas, color o nacionalidad; y la igual protección de las leyes es una garantía de la protección de leyes iguales." (*Yick Wo* v. *Hopkins*, 118 U. S. 356, 69).

El poder para aprobar leyes referentes a la admisión de extranjeros pertenece, desde luego, al Congreso (*Hines v. Davidowitz*, 312 U. S. 52). "El afirmar una autoridad para negarle a los extranjeros la oportunidad de ganarse la vida cuando son admitidos legalmente en el estado, equivaldría a afirmar el derecho a negarles la entrada y albergue, ya que en los casos corrientes ellos no pueden vivir donde no pueden trabajar. Y, de permitirse tal política, el resultado práctico sería que aquellos legalmente admitidos al país bajo la

autoridad de las leyes del Congreso, en vez de disfrutar de una manera sustancial y en todo su alcance los privilegios otorgádosles por la admisión, serían segregados en aquellos estados que decidieran ofrecer hospitalidad. (*Truax* v. *Raich,* 239 U. S. 33, 42, declarando nula una ley estatal prohibiendo el empleo de más del 20 por ciento de extranjeros en cualquier ocupación).

En este caso no hay ninguna alegación al efecto de que el peticionario se dedicaba a otra cosa que no sea comercio ordinario. Bajo tales circunstancias, como hemos visto, él tiene nuestra "garantía de la protección de leyes iguales". Al enunciar esta noble regla y acto seguido sostener la imposición de contribuciones discriminatorias sobre el producto de tal comercio ordinario, estaríamos convirtiendo las promesas héchasles bajo nuestras leyes a los extranjeros en "no más que promesas ilusorias". (*Ex Parte Kumezo Kawato,* _ _ _ _ _ _ U. S. _ _ _ _, 87 L. ed. 94).

Hasta donde nos ha sido posible determinar, ningún estado, ni el Gobierno Federal, ha tratado de imponer contribuciones sobre ingresos que discriminen contra extranjeros residentes. Ninguna de las partes en este caso nos ha llamado la atención hacia ningún estatuto que envuelva un discrimen en alguna otra clase de tributación, basada únicamente en la extranjería. Sin embargo, de nuestra propia búsqueda han surgido dos casos en los cuales las cortes han anulado tales leyes por inconstitucionales. Una enmienda a la constitución de California, imponiendo sobre todo varón extranjero adulto una contribución (*poll tax*), la cual no fué impuesta sobre los ciudadanos, fué declarada nula porque negaba la igual protección de las leyes. *Ex Parte Kotta,* 200 Pac. 957. La Corte dijo, a la pág. 958:

". . . Expuesto muy generalmente, el requisito es de igual protección y seguridad para todos, ciudadanos y extranjeros por igual, bajo las mismas circunstancias en el disfrute de sus derechos personales y civiles, y en la imposición de obligaciones, tales como penalidades, contribuciones, etc."

Para un comentario interesante sobre *Ex Parte Kotta*, véase 35 Harv. L. Rev. 469. En *Hines* v. *Davidowitz*, supra, en el cual la sentencia de la corte inferior declarando nula una ley de Pennsylvania que exigía a los extranjeros que se registraran de acuerdo con una ley estatal fué confirmada, un Juez de Circuito muy competente dijo en su opinión en la corte inferior que el caso de Davidowitz era "exactamente igual" al de *Ex Parte Kotta* (30 Fed. Supp. 470, 76).

Un estatuto de Pennsylvania, que imponía una contribución de tres centavos al día por el empleo de cada extranjero varón adulto, y que autorizaba al patrono a descontar la referida contribución del jornal de tales empleados, fué igualmente declarado nulo tanto en la Corte Federal como en la del estado, porque negaba a los extranjeros envueltos la igual protección de las leyes. (*Fraser* v. *McConway & Torley Co.*, 82 F. 257; *Juniata Limestone Co.* v. *Fagley*, 187 Pa. 193, 40 A. 977).

No vemos cómo podamos dejar de aplicar a los hechos del presente caso la doctrina establecida en los casos de California y Pennsylvania. En un esfuerzo para justificar los tipos más altos exigidos a residentes extranjeros, el Tribunal de Apelación de Contribuciones afirma que ellos equivalen a una especie de pago retrasado por el producto de generaciones de civilización que encuentra aquí el extranjero a su llegada y que empieza a disfrutar sin haber contribuído a su costo. Pero la ley misma no establece tal distinción. El tipo mayor se le impone al extranjero que ha residido aquí durante muchos años, y no al ciudadano llegado recientemente. En verdad, el describir así la ley constituye más aun una invasión del control exclusivo sobre la inmigración que corresponde al Gobierno Federal (*Hines* v. *Davidowitz*, supra). Y si la ley, para ser consistente con el razonamiento del Tribunal de Apelación de Contribuciones hubiera provisto los tipos más altos de contribución sobre ingresos para los ciudadanos de los Estados Unidos domiciliados en Puerto Rico basados únicamente en el hecho de su llegada a esta isla en años re-

cientes, ello constituiría presumiblemente una intervención impropia con el derecho ilimitado de los ciudadanos de los Estados Unidos de circular libremente dentro de los límites territoriales de los Estados Unidos (*Edwards* v. *California,* 314 U. S. 160).

Resta sólo indicar que este discrimen contra los extranjeros no solamente viola la disposición de nuestra Carta Orgánica en cuanto a igual protección, que es una cláusula genérica, sino también la más específica disposición de que "las leyes para la imposición de contribuciones en Puerto Rico serán uniformes". Esta ley, que dispone diferentes tipos dentro de nuestros límites territoriales, sin una base razonable de clasificación, está en pugna con dicha cláusula. *Juniata Limestone Co.* v. *Fagley,* supra.

La propia Legislatura ya ha decidido que este discrimen contra los extranjeros residentes debe ser abolido, y lo eliminó enmendando la sección 12 de la Ley de Contribuciones sobre Ingresos mediante la sección 3, Ley núm. 20, Leyes de Puerto Rico, Tercera Sesión Extraordinaria, 1942 ((2) pág. 97).

Nuestra decisión, desde luego, no vicia toda la contribución impuesta al peticionario. Sólo tiene derecho a uniformidad, o a igual protección, lo que significa que se calculará su contribución al mismo tipo que a los ciudadanos residentes. *San Juan Trading Co.* v. *Sancho,* 114 F. (2d) 969, 75.

El peticionario alega que la Legislatura no tuvo la intención de que los cambios en tipos y otras materias dispuestos por las Leyes núms. 31 y 159, Leyes de Puerto Rico, 1941, tuvieran efecto retroactivo hasta el 1º de enero de 1940. La sección 29 de la Ley núm. 31 y la sección 8 de la Ley núm. 159 disponen que "existe una necesidad y emergencia para la retroactividad de la presente Ley y empezará a regir a los noventa días después de su aprobación, la que tendrá efecto a contar del día primero de enero de mil novecientos cuarenta." A pesar de esta disposición, el peticionario asume la posición de que estas leyes tienen efecto desde el

1º de enero de 1941. Basa su alegación en una disposición similar de una ley subsiguiente, sección 11, Ley núm. 23, Leyes de Puerto Rico, 1941, Sesión Extraordinaria, aprobada el 21 de noviembre de 1941, disponiendo que ésta tendrá efecto retroactivo a enero 1, 1941. En tanto en cuanto la Ley núm. 23 enmienda las Leyes núms. 31 y 159, la Ley núm. 23, por supuesto, es efectiva desde el 1º de enero de 1941. Pero no podemos seguir al peticionario en su alegación de que la fecha efectiva de la Ley núm. 23—enero 1, 1941—reemplaza completamente la fecha efectiva fijada en las Leyes núms. 31 y 159—enero 1, 1940—para las últimas leyes.

El peticionario seguidamente alega que las Leyes núms. 31 y 159 de 1941, si se aplican retroactivamente a enero 1, 1940, violan el debido procedimiento de ley. Su posición es en síntesis que, una vez pagadas las contribuciones sobre sus ingresos de 1940 bajo la ley entonces en vigor, la Legislatura carecía de poder para aumentar esas contribuciones de 1940 por una ley aprobada en 1941.

Las autoridades contrarias a esta contención son abrumadoras. La cuestión ha sido decidida desde 1873, cuando la Corte Suprema de Estados Unidos sostuvo la validez de una ley imponiendo una contribución sobre todos los ingresos del año precedente, a pesar de que una contribución sobre tal ingreso había sido pagada ya. *Stockdale* v. *The Insurance Companies,* 87 U. S. (20 Wall.) 323.

Desde esa fecha se han sostenido consistentemente diversas leyes retroactivas de contribuciones sobre ingresos. (*Welch* v. *Henry,* 305 U. S. 134 (comentado en 52 Harv. L. Rev. 692 (1939)); *Brushaber* v. *Union Pac. R. R.,* 240 U. S. 1; *Cooper* v. *United States,* 280 U. S. 409; *Osburn California Corporation* v. *Welch,* 39 F. (2d) 41 (C.C.A. 9th, 1930); *Phipps* v. *Bowers,* 49 F. (2d) 996 (C.C.A. 2nd, 1931); Ballard, *Retroactive Federal Taxation,* 48 Harv. L. Rev. 592, 597–601; Nota, *Constitutionality of Retroactive Federal Taxing Statutes,* 28 Col. L. Rev. 777; 1 Mertens, *Law of Federal Income Taxation* (1942), Sec. 4.15, pág. 154. Véase la opi-

nión disidente del Juez Sr. Brandeis en *Untermeyer* v. *Anderson,* 276 U. S. a la pág. 440 *et seq.*). Los únicos casos en que la Corte Suprema de Estados Unidos ha resuelto que una ley contributiva es nula por ser retroactiva no envolvían contribuciones sobre ingresos, y todas fueron decisiones cerradas con vigorosas opiniones disidentes. (*Nichols* v. *Coolidge,* 274 U. S. 531, en que estaba envuelta una contribución sobre herencia; *Blodgett* v. *Holden,* 275 U. S. 142, y *Untermeyer* v. *Anderson,* 276 U. S. 440, en que estaba envuelta una contribución sobre donaciones). Estos casos de contribuciones sobre donaciones y herencias son distinguidos en *Welch* v. *Henry,* supra, que pronto pasaremos a discutir. Y aun dentro de su propio campo, *cf. Milliken* v. *United States,* 283 U. S. 15, 21, *et seq.*

*Welch* v. *Henry,* supra, envolvía una ley de Wisconsin de 1935 imponiendo contribuciones sobre dividendos corporativos recibidos por el contribuyente en 1933, aun cuando dichos dividendos no eran tributables bajo la ley en vigor en 1933 (v. g. eran deducibles del ingreso bruto). La opinión de la Corte Suprema, escrita por el Juez Presidente Stone, lee en parte como sigue a las págs. 146–50:

"La objeción levantada principalmente contra la ley contributiva es que niega el debido procedimiento de ley porque imponía en 1935 una contribución sobre ingreso recibido en 1933. Pero una contribución no es necesariamente inconstitucional porque sea retroactiva. *Milliken* v. *United States,* 283 U. S. 15, 21; y casos en él citados. Una contribución no es ni una penalidad impuesta al contribuyente ni una responsabilidad contractual que éste asume. No es sino una manera de prorratear el costo del gobierno entre aquellos que en alguna medida tienen el privilegio de gozar de sus beneficios y que deben soportar sus cargas. Como ningún ciudadano goza de inmunidad de tal carga, la imposición retroactiva no viola necesariamente el debido procedimiento de ley, y para impugnar la presente contribución no es suficiente señalar que el suceso tributable, el recibo del ingreso, precedió a la ley.

"En los casos en que esta Corte ha sostenido la nulidad de contribuciones sobre donaciones hechas y completamente adquiridas antes de la aprobación del estatuto contributivo, la decisión descansó en

el fundamento de que la naturaleza o cantidad de la contribución no pudo anticiparse razonablemente por el contribuyente al tiempo de realizar el acto voluntario específico que la ley posteriormente constituyó en suceso tributable. *Nichols* v. *Coolidge,* 274 U. S. 531, 542; *Untermeyer* v. *Anderson,* 276 U. S. 440, 445 (citando *Blodgett* v. *Holden,* 275 U. S. 142, 147); *Coolidge* v. *Long,* 282 U. S. 582. Como en cada uno de estos casos el donante pudo libremente escoger entre dar o no dar, la imposición de una contribución, después de hacerse la elección, sobre una donación que el donante pudo haberse abstenido de hacer si hubiese anticipado la contribución, se consideró tan arbitraria y opresiva que constituía una negación del debido procedimiento de ley. Pero hay otras contribuciones cuya retroactividad no puede decirse que sea igualmente perjudicial, porque no recae sobre un acto voluntario del contribuyente. Y hasta una contribución retroactiva sobre donaciones se ha sostenido válida cuando el donante ha sido prevenido por las leyes de la posibilidad de tal imposición, *Milliken* v. *United States,* supra. En cada caso es necesario considerar la naturaleza de la contribución, y las circunstancias bajo las cuales se impone antes de que pueda sostenerse que su aplicación retroactiva es tan severa y opresiva como para traspasar la limitación constitucional.

"Contribuciones sobre la propiedad y sobre los beneficios conferidos a bienes inmuebles aplicadas retroactivamente no están sujetas a la objeción levantada con éxito en los casos de donaciones. Véase *Wagner* v. *Baltimore,* 239 U. S. 207; *Seattle* v. *Kelleher,* 195 U. S. 351; compárese *Citizens National Bank* v. *Kentucky,* 217 U. S. 443, 454; *Billings* v. *United States,* 232 U. S. 261, 282. *Igualmente, una contribución sobre el recibo del ingreso no es comparable con una contribución sobre donación. No podemos asumir que los accionistas rechazarían los dividendos corporativos aunque supieran que su recibo estaría sujeto posteriormente a una nueva contribución o al aumento de la contribución vigente.* La objeción a la presente contribución es de distinta naturaleza y se refiere a la inconveniencia específica del contribuyente al ser requerido, después de transcurrido el tiempo acostumbrado para la imposición y pago de la contribución, para soportar una carga contributiva de la cual se alega, no fué avisado y que no pudo anticipar.

"Asumiendo que una contribución trate de cubrir acontecimientos tan remotos en el pasado que haga válida tal objeción, no creemos que sea ése el caso presente. Por más de setenta y cinco años ha sido la práctica legislativa acostumbrada del Congreso en la apro-

bación de leyes contributivas el imponer la contribución retroactivamente sobre ingresos o beneficios recibidos durante el año de la sesión en que la ley es aprobada, *y en algunos casos durante el año de la sesión anterior.* . . . La alegación de que la aplicación retroactiva de las leyes de Rentas Internas constituye una negación del debido procedimiento de ley garantizado por la Enmienda Quinta ha sido uniformemente rechazada. . .

". . . creemos que las 'transacciones recientes' que esta Corte ha declarado sujetas a una ley contributiva con efecto retroactivo, *Cooper* v. *United States*, 280 U. S. 409, 411, deben incluir el recibo de ingreso durante el año de la sesión legislativa anterior a su aprobación." (Bastardillas nuestras).

Las leyes aquí impugnadas conforman con el criterio para la validez de contribuciones retroactivas sobre ingresos que se establece en *Welch* v. *Henry*. Las Leyes núms. 31 y 159 fueron aprobadas en la sesión regular de 1941, y por tanto válidamente "incluían el recibo de ingreso durante el año de la sesión legislativa anterior a su aprobación [1940]." Como en *Welch* v. *Henry* (pág. 151), "la Legislatura en [1941], en su primera oportunidad después del año tributable en que el ingreso fué recibido, revisó las leyes contributivas aplicables al ingreso de [1940] . . .".

La cuestión de contribuciones sobre ingreso con carácter retroactivo no es nueva en esta jurisdicción. *Fantauzzi et al.* v. *Bonner*, 34 D.P.R. 487; *Central Eureka* v. *Gallardo*, 39 D.P.R. 344. El caso de la *Central Eureka* sostuvo que no había impedimento constitucional para que una ley de contribuciones sobre ingresos insular aprobada el 6 de agosto de 1925, tuviera efecto retroactivo a enero 1, 1924. "La idea de legislación como la presente," dijo esta Corte, a través de su Juez Asociado Sr. Wolf, en el caso de la Central Eureka, a la pág. 350, "es que una contribución corriente debe ser fijada por los ingresos del año anterior." Esta manera de abordar el problema surge del lenguaje similar usado en *Stockdale* v. *Insurance Companies*, 87 U. S. (20 Wall.) 323, 31 (repetido con aprobación en *Brushaber* v. *Union Pac. R. R.*, 240 U. S. 1, 20) de que "El derecho del

Congreso de imponer esta contribución a través de una nueva ley, aunque su medida fuese determinada por el ingreso del año anterior, no puede ponerse en duda; . . . ''.

Es interesante observar que un plan para pagar a medida que se reciba el ingreso (*pay-as-you-go plan*) se está discutiendo ahora en el Congreso, por medio del cual los contribuyentes pagarán las contribuciones de 1943 a medida que van recibiendo los ingresos de 1943. En resumen, la elección del *anterior* o del *presente* año como medida para una contribución *actualmente* impuesta es una que debe la Legislatura hacer.

En qué punto la imposición retroactiva de contribuciones sobre ingresos equivaldría a privar de la propiedad sin el debido procedimiento de ley, es, al igual que en otros problemas constitucionales aquí envueltos, una cuestión relativa (*a question of degree*). "En cada caso es necesario tomar en consideración la naturaleza de la contribución y las circunstancias bajo las cuales se impone. . . . '' (*Welch v. Henry*, supra, a la pág. 147). La "naturaleza de la contribución'' aquí es una contribución sobre ingresos. El "argumento frecuentemente usado de que la conducta del contribuyente hubiera sido diferente si el estatuto hubiera estado en vigor [en la fecha en que el contribuyente actuó] difícilmente puede aplicarse a la contribución sobre ingresos con efecto retroactivo''. (28 Col. L. Rev., supra, a la pág. 78; los corchetes nuestros). Y en cuanto a las circunstancias en este caso, ya hemos visto que la retroactividad de las leyes en cuestión cae dentro de la regla del caso de *Welch v. Henry*.

El caso de *People* v. *Graves*, 21 N. E. (2d) 371 (N. Y. 1939), que declara nula una disposición en un estatuto de contribución sobre ingresos con efecto retroactivo a dieciséis años, es claramente inaplicable a los hechos del presente caso.

■■ El peticionario alega que aún cuando sea válido el aumento con efecto retroactivo de los tipos fijados en las

Leyes núms. 31 y 159, la imposición· de contribuciones con efecto retroactivo sobre partidas que previamente estaban exentas y la exigencia con efecto retroactivo de una planilla conjunta de los cónyuges, son nulas. "Sin lugar a dudas el Congreso tiene poder para condicionar, limitar o negar deducciones del ingreso bruto para computar el ingreso neto sobre el cual quiere imponer la contribución" (*Helvering* v. *Ind. Life Ins. Co.,* 292 U. S. 371, 81). No vemos diferencia alguna entre la eliminación con efecto retroactivo de disposiciones que hoy la Legislatura no considera prudentes, y el aumento de los tipos presentes. La Corte Suprema ha sancionado específicamente esa acción en *Welch* v. *Henry,* supra, págs. 144, 5, en que se eliminó con efecto retroactivo la exención de dividendos en la contribución de individuos. Véase también *Wisconsin* v. *J. C. Penney Co.,* 311 U. S. 435, 42.

La prohibición constitucional contra "leyes *ex post facto*" abarca solamente estatutos criminales. *Calder* v. *Bull,* 3 Dall. 385 (U. S. 1798). Hasta que el gobierno trate de invocar las penalidades dispuestas en los estatutos aquí envueltos, no hay motivo para investigar su alegado efecto retroactivo.

Alegando que los tipos dispuestos en los estatutos aquí envueltos resultan en su caso en un aumento de 623 por ciento sobre los tipos anteriores, el peticionario se queja de que tal contribución es confiscatoria y lo priva por tanto de su propiedad sin el debido procedimiento de ley. Antes de enfrascarnos en una discusión sobre este punto, conviene limitar el alcance de nuestra investigación. " . . . si una contribución es sabia o conveniente es de la incumbencia de las ramas políticas del gobierno y no de la nuestra. Las consideraciones a ser tomadas en cuenta al declarar nula una medida contributiva son enteramente distintas de aquellas que concurren para justificar la desaprobación de una contribución a base de imprevisión política o económica." (Juez Sr. Frankfurter, al concurrir en *State Tax Comm'n* v. *Aldrich,* 316 U. S. 174, 184). Al plantear la misma tesis, Holmes

arrojó mayor luz sobre la clásica frase de Marshall al indicar que "El poder de imponer contribuciones no constituye poder para destruir, mientras esta Corte exista." (Opinión disidente, *Panhandle Oil Co.* v. *Knox,* 277 U. S. 218, 23). Pero debe darse énfasis al hecho de que "esta Corte existe" para evitar la *destrucción* mediante imposición de contribuciones, y no para determinar sobre la sabiduría o practicabilidad o política envuelta en estatutos contributivos. *Brushaber* v. *Union Pac. R. R.*, 240 U. S. 1, 24, 25.

Las leyes sobre contribuciones, tanto en cuanto a su interpretación estatutaria como en cuanto a sus aspectos constitucionales, han estado en ebullición durante los últimos años. En las decisiones de la Corte Suprema de los Estados Unidos se hallan ejemplos de "cambio [s] importante [s] en doctrina constitucional [en casos contributivos] . . . . al cambiar el personal de la Corte." (El Juez Frankfurter al concurrir en *Graves* v. *N. Y. Ex Rel. O'Keefe,* supra, a la pág. 487). No es una exageración decir que la ley de contribuciones ha venido a ser una de las cosas más complejas de esta generación. Sus efectos alcanzan a todas las actividades cotidianas. No es, pues, extraño que cuando se discute sobre contribuciones, la emoción, esa enemiga del juicio objetivo, se excite. Tales discusiones son susceptibles de degenerar en frases hechas (*slogans*) de un lado y epítetos del otro—susurros en pugna con gruñidos—cada cual con matices y tonalidades de gran magnetismo. Pero las cortes no son el sitio para dirimir tal conflicto. No podemos, mediante el uso de adjetivos partidistas (*advocate adjectives*) recurrir a lo que se ha llamado jurisprudencia epitética. Ni debemos tampoco enfrascarnos en agilidad verbal con el fin de racionalizar nuestras propias predilecciones.

Sin embargo, nuestro papel, aunque limitado, no se desarrolla en un vacío. Cuando los hechos son suficientemente abrumadores, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la

jurisprudencia consiste en desconocer metódicamente lo que todo el mundo sabe. Sin elaborar más aun lo que es obvio, nos dedicaremos a determinar, no si las contribuciones en cuestión eran excesivas, sino si eran confiscatorias.

Los estatutos que aquí se atacan fueron aprobados varios meses antes de entrar los Estados Unidos en la presente guerra. Pero si la Legislatura previó que nuestra participación en la guerra era inminente, no puede tachársele de ser un mal profeta. Y en verdad estaríamos desconociendo metódicamente lo que todo el mundo sabe si dejásemos de reconocer que muchas fuentes de tributación insular, incluyendo contribución sobre ingresos, han sido eliminadas o notablemente reducidas por el efecto de la guerra sobre la economía de Puerto Rico. Todos los derechos federales sobre importación y las rentas internas sobre el ron ingresan en el Tesoro Insular por disposición de la Ley Federal. Estos impuestos, que representan una parte considerable de los ingresos insulares, han mermado considerablemente debido a la paralización virtual de embarques para y desde Puerto Rico. La misma falta de embarques ha ocasionado hondas huellas en la transportación a Puerto Rico de abonos para la caña de azúcar, y amenaza con afectar la transportación de azúcar cruda desde Puerto Rico, la producción de la cual ha constituído por muchos años la espina dorsal de la economía de Puerto Rico. El torrente de arbitrios sobre automóviles, gasolina y sobre muchas otras necesidades diarias que normalmente fluye al Tesoro Insular se ha agotado debido a la interrupción en los embarques de tales productos a Puerto Rico. Si la Legislatura previó este desquiciamiento de nuestra economía y quiso suavizar el golpe y reforzar nuestras finanzas mediante la imposición de mayores contribuciones sobre ingresos, no hallamos justificación alguna para sustituir nuestro criterio por el de ella en cuanto a la necesidad o conveniencia de todas o parte de estas contribuciones.

Pero aun sin referirnos a las condiciones creadas por la guerra, no necesitamos hacer mención de legislación específica con el fin de elaborar la cuestión obvia de que en los últimos años todos los gobiernos, nacional o locales, han extendido sus funciones. Un gran jurista ha descrito las contribuciones como el precio que pagamos por vivir en una sociedad civilizada. Con ellas—Holmes solía decir—compramos la civilización. (Paul, *Studies in Federal Taxation, Third Series, Preface vi*). "Y el concepto de bienestar general tampoco es estático. Las necesidades que eran limitadas y sin importancia un siglo ha, pueden estar en nuestros días en íntima relación con el bienestar de la Nación. Lo que es imperativo o urgente cambia con los tiempos." (El Juez Cardozo en *Helvering* v. *Davis,* 301 U. S. 619, 41). En una palabra, ya si la tributación aumentada tuvo su origen en las exigencias de la guerra o ya si se requería para hacer frente a nuevas o más amplias funciones de gobierno, no vemos en qué forma, salvo decidiendo que son confiscatorias, podamos intervenir con el criterio legislativo al imponerlas.

¿Fueron confiscatorias las contribuciones impuestas al peticionario? Plantear la cuestión y la regla de ley es engañosamente simple. Resulta algo más difícil aplicarla a los hechos de un caso específico. En el presente caso "las distinciones decisivas son en cuanto a grado y no en cuanto a naturaleza. Nos esforzamos en vano por hallar una fórmula verbal que suministre la clave infalible. El criterio . . . no es una regla de ley; es más bien un método de vida." (*Welch* v. *Helvering,* 290 U. S. 111, 14, 15).

No trataremos de desmenuzar el aumento de 623 por ciento en contribución sobre ingresos a que el peticionario se queja ha sido sometido. Observamos solamente que el aumento no representa únicamente tipos más altos. Gran parte de él emana de la eliminación de exenciones, créditos y privilegios, ya discutida en esta opinión y declarada válida. Y él se librará de una parte de dicho aumento en vir-

tud de nuestra decisión al efecto de que debe imponérsele contribución en su carácter de extranjero residente al mismo tipo que a los ciudadanos residentes.

Puede concederse que el resultado práctico constituye un aumento sorprendente en la contribución sobre ingresos del peticionario. Pero nos es difícil comprender cómo puede el peticionario, no importa lo excesiva que considere él esta contribución, insistir seriamente en la contención de que la Ley Insular de Contribuciones sobre Ingresos es confiscatoria si se tiene en mente que en efecto ésta desempeña en Puerto Rico la misma función que la Ley Federal de Contribuciones sobre Ingresos desempeña en los Estados Unidos continentales, y que los tipos de nuestra ley hasta la fecha no han llegado al nivel de los tipos de la Ley Federal. Podría quizá argüirse que la comparación entre nuestros tipos de contribución sobre ingresos y los federales no provee una contestación definitiva, toda vez que otras formas de tributación, especialmente los arbitrios, juegan un papel mayor aquí que en el sistema Federal. El contribuyente podría argüir también que la tributación Federal sobre ingresos se ha elevado considerablemente debido a la guerra. Pero el gobierno podría replicar que hoy día las emergencias no pueden aislarse, y que en la interrelación de emergencias internacionales, nacionales e insulares un contribuyente específico no puede afirmar capciosamente que únicamente él permanecerá inmune a las necesidades urgentes y en constante expansión del gobierno en tiempos de paz y en tiempos de guerra. Todo esto da énfasis a la esencial ineficacia del esfuerzo hecho en muchos casos para anular estatutos contributivos mediante litigios esporádicos. Aquellos que se oponen a lo que consideran contribuciones excesivas deben, bajo nuestra forma de gobierno, recurrir en la mayoría de los casos a las urnas electorales y no a las cortes. ''La democracia no puede evitar sus sectores agitadores. Cada interés tiene sus reclamaciones imperiosas. Estos sectores compiten en los mercados, en las tribunas de opinión pública, en

las elecciones populares, y en nuestras cámaras legislativas, pero no tienen sitio en las salas donde se imparte justicia." (Charles Evans Hughes, 18 *Proc. of Am. Law Inst.* (1941) 24, 29).

Con toda seguridad la legislatura que aprobó estas leyes, al reflexionar sobre las mismas, no creyó que hubiese exagerado la necesidad de rentas públicas. En una sesión extraordinaria celebrada en 1942 dispuso aumentos adicionales en los tipos de contribución de que se queja ahora el peticionario (Secciones 3 y 4 de la Ley núm. 20, Leyes de Puerto Rico, Tercera Sesión Extraordinaria, 1942, que enmiendan las secciones 12 y 13 de la Ley de Contribuciones sobre Ingresos). Y es en verdad sombrío el cuadro que pintó la Legislatura de las condiciones que hacen tales aumentos imperativos. (Sección 1—Exposición de Motivos, Ley núm. 16, Leyes de Puerto Rico, Tercera Sesión Extraordinaria, 1942).

A la luz de las innumerables consideraciones aquí expuestas, se "necesitaría un gesto de arrogancia" (*De la Torre* v. *National City Bank of New York,* 110 F. (2d) 976, 983) para nosotros resolver simplemente que una contribución de $6,570.49 (menos las reducciones que deberán hacerse de acuerdo con la conclusión a que hemos llegado eliminando los tipos más altos aplicables a extranjeros residentes) sobre un ingreso neto de $39,058.90 está en pugna con la prohibición constitucional contra confiscación y despojo de la propiedad so pretexto de ejercer el poder de imponer contribuciones.

Para evitar que se nos interprete mal, deseamos agregar que no estamos resolviendo ni sugiriendo que no existe límite a la contribución sobre ingresos. Resolvemos únicamente que ésta es una cuestión relativa (*question of degree*) y que, bajo todas las circunstancias mencionadas, el caso ante nuestra consideración no trasciende los límites. (Véase opinión disidente del Juez Holmes en *Louisville Gas Co.* v. *Coleman,* 277 U.S. 32, 41).

*La decisión del Tribunal de Apelación de Contribuciones
será modificada en el sentido de disponer que se imponga la
contribución al peticionario al mismo tipo que a ciudadanos
residentes. Y así modificada, la decisión será confirmada y
el caso devuelto al Tribunal de Apelación de Contribuciones
a fin de que se calcule sobre esa base la contribución aquí
envuelta.*