GILBERT J. POSTLEY, demandante y apelante, *v.* SECRETARIO DE HACIENDA, demandado y apelado.

Número 10798.
*Sometido:* 6 de marzo de 1953. *Resuelto:* 2 de febrero de 1954.

*Fiddler, González & Nido* y *Andrés Guillemard,* abogados del apelante; *Hon. Secretario de Justicia José Trías Monge* y *Manuel J. Medina Aymat, Procurador Auxiliar,* abogados del apelado; *Charles R. Hartzell* y *Rafael O. Fernández,* como *amici curiae.*

El Juez Presidente Señor Snyder emitió la opinión del tribunal.

La sección 12 de la Ley de Contribuciones sobre Ingresos, según fué enmendada por la Ley núm. 88, Leyes de Puerto Rico, 1945, dispone el cobro de una contribución normal del 7 por ciento sobre el ingreso neto de todo individuo, con excepción de que todo individuo no residente, que no sea ciudadano de Puerto Rico, viene obligado a pagar una contribución normal del 29 por ciento sobre su ingreso neto. La sección 13, según fué enmendada por la Ley núm. 433, Leyes de Puerto Rico, 1947 ((1) pág. 889), dispone el cobro de una contribución adicional progresiva a los individuos residentes, que no es aplicable a los no residentes que no sean ciudadanos de Puerto Rico "en consideración a que éstos pagan una contribución normal de veintinueve por ciento (29%)." La sección 18, según fué enmendada por la Ley núm. 433, concede una exención personal de $800 a toda persona soltera y una de $2,000 a todo jefe de familia o a toda persona casada que viva con su esposo o esposa; también concede un crédito de $400 por cada dependiente. Tales deducciones no son concedidas a los no residentes. La sección 19 (*f*), según fué enmendada por la Ley núm. 433, dispone que los no residentes que no sean ciudadanos de Puerto Rico, no tendrán derecho a las exenciones o créditos personales antes mencionados, sino que vienen obligados a pagar una contribución fija del 29 por ciento.

En *Buscaglia, Tesorero* v. *Tribunal de Contribuciones, Isabel Pérez Vahamonde, Interventora,* 68 D.P.R. 345, declaramos válidas las anteriores disposiciones de la Ley de Contribuciones sobre Ingresos en tanto en cuanto eran aplicables al ingreso para el año contributivo que terminó el 31 de di-

ciembre de 1943. (¹) Resolvimos que estas secciones no infringían las cláusulas de uniformidad contributiva, de igual protección y del debido procedimiento de la Carta Orgánica, no obstante el hecho de que las mismas (1) imponían un tipo mayor de contribución normal a los no residentes que no sean ciudadanos de Puerto Rico y (2) denegaban a tales no residentes la exención personal y los créditos por dependientes a los cuales tenían derecho los residentes. Asimismo resolvimos en el caso de *Pérez* que las referidas secciones de nuestra Ley de Contribuciones sobre Ingresos no infringían las cláusulas de privilegios e inmunidades de la Constitución de los Estados Unidos—sección 1 de la Enmienda XIV y artículo IV, sec. 2, párr. 1—ya que dichas cláusulas no son aplicables a Puerto Rico. (²)

El caso de *Pérez* fué argumentado ante este Tribunal el 1ro. de julio de 1947. Mientras estaba pendiente de resolución, el Congreso el 5 de agosto de 1947 adicionó una cláusula de privilegios e inmunidades al artículo 2 de la Carta Orgánica. 61 Stat. 772; 48 U.S.C. 737. (³) Dijimos en el caso de *Pérez* a la pág. 358 que esta nueva cláusula se aplica prospectivamente y que por tanto no podía la misma afectar el

---

(¹) En 1943 los tipos contributivos eran ligeramente más bajos que los aquí envueltos, pero la diferencia no es suficiente como para afectar las cuestiones suscitadas en el presente caso.

(²) En el caso de *Pérez* expresamente revocamos los casos de *Fiddler* v. *Tribl. Contribuciones*, 65 D.P.R. 202, y *Buscaglia, Tes.* v. *Tribl. Contribuciones, Antonio Ahumada Valdés, Interventor*, 65 D.P.R. 977, en tanto en cuanto dichos casos resolvían que un no residente que no es ciudadano de Puerto Rico tenía derecho a invocar las cláusulas de privilegios e inmunidades de la Constitución Federal y las cláusulas de uniformidad e igual protección de la Carta Orgánica. La Corte de Apelaciones para el Primer Circuito ha indicado, al revocar el caso de Ahumada, que el caso de *Pérez* fué resuelto correctamente por nosotros. *Buscaglia* v. *Ahumada*, 171 F.2d 775 (C. A. 1, 1949). El caso de *Fiddler* fué revocado por la Corte de Apelaciones por motivos procesales y devuelto para ulteriores procedimientos. *Buscaglia* v. *Fiddler*, 157 F.2d 579 (C. A. 1, 1946). Ordenamos al anterior Tribunal de Contribuciones que efectuara dichos ulteriores procedimientos en *Fiddler* v. *Tribl. Contribuciones*, 68 D.P.R. 847, y el caso nunca volvió a nosotros de nuevo.

(³) Para el texto de esta cláusula, véase el escolio 6, infra.

A los fines de la mayor claridad, a menos que se indique otra cosa,

resultado de dicho caso, que envolvía ingresos de 1943. En su consecuencia, dejamos pendiente la cuestión de su efecto sobre la Ley de Contribuciones sobre Ingresos en tanto en cuanto ésta se aplicaba a ingresos recibidos o devengados con posterioridad al 5 de agosto de 1947. El presente caso, que trata de ingresos correspondientes al año económico que terminó el 30 de junio de 1948, levanta la cuestión que dejamos pendiente en el caso de *Pérez*.

 Desde el 5 de agosto de 1947 hasta la fecha, Gilbert J. Postley ha sido ciudadano de los Estados Unidos y ciudadano del estado de Nueva York, y no residente de Puerto Rico.[4] Como dueño de 450 acciones preferidas de la Eastern Sugar Associates, tenía derecho a recibir dividendos sobre estas acciones en la suma de $2,250 por el período del 20 de agosto de 1947 al 20 de mayo de 1948. A tenor con la sección 22 de la Ley de Contribuciones sobre Ingresos, la sucursal de San Juan del National City Bank de Nueva York, le retuvo, como agente retenedor, la suma de $652.51 de los referidos $2,250. Dicha cantidad de $652.51 representaba la contribución del 29 por ciento impuesta a Postley por la sección 12 de la Ley como un no residente que no era ciudadano de Puerto Rico para el año económico que terminó el 30 de junio de 1948. Postley radicó querella solicitando el reintegro de la suma de $652.51, por el fundamento de que su cobro infringía la nueva cláusula de privilegios e inmunidades del artículo 2 de la Carta Orgánica. El Tribunal Superior dió por sometido el

dondequiera que usamos la frase "cláusula de privilegios e inmunidades" de la Carta Orgánica, debe entenderse como que significa solamente aquella parte de la misma que hace el inciso 1 de la cláusula 2 del artículo IV de la Constitución Federal aplicable a Puerto Rico. No discutimos en detalle en esta opinión el problema de la aplicación a Puerto Rico, en virtud de la Ley del Congreso del 5 de agosto de 1947, de la cláusula de privilegios e inmunidades que se encuentra en la sección 1 de la Enmienda XIV. Dejamos dicha cuestión pendiente en este caso. Véase el escolio 15.

[4] Nuevamente, a los fines de la claridad, indicamos que, a menos que otra cosa se exprese, a través de esta opinión las palabras "no residente" significan un ciudadano de los Estados Unidos y de uno de los estados de la Unión que no es un residente de Puerto Rico dentro del significado de nuestra Ley de Contribuciones sobre Ingresos.

caso a base de una estipulación de hechos y dictó sentencia declarando sin lugar la demanda. El caso se encuentra ahora ante nos en apelación instada por Postley contra dicha sentencia.

Desde el año 1823 la Corte Suprema interpretó la cláusula de privilegios e inmunidades que se halla en el artículo IV, sección 2 de la Constitución Federal en el sentido de que impide a un estado imponerle contribuciones a ciudadanos de otro estado a un tipo mayor que el impuesto a sus propios ciudadanos. *Cordfield* v. *Coryell,* 4 Wash. 371 (C. C. Pa., 1823). En *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, se resolvió que una contribución impuesta por un estado sobre el ingreso de residentes y no residentes, que concede exenciones a los residentes, con aumentos para individuos casados y por dependientes, pero que no concede exenciones equivalentes a los no residentes, menoscaba los privilegios e inmunidades de los ciudadanos de otros estados, en violación de la sección 2 del artículo IV de la Constitución Federal. En el caso de *Travis* la Corte dijo a la pág. 78:

"El propósito de la disposición [art. IV, sec. 2 de la Constitución Federal] vino a nuestra consideración en el caso de *Paul* v. *Virginia,* 8 Wall. 168, 180, donde la Corte, por voz del Juez Asociado Sr. Field, dijo: 'Indudablemente que los fines de la cláusula en cuestión fueron poner a los ciudadanos de cada estado en el mismo nivel que los ciudadanos de los otros estados, en lo que se refería a los beneficios provenientes de la ciudadanía de dichos estados. Los releva de las desventajas de la extranjería en otros estados; prohibe legislación discriminatoria contra ellos por otros estados; les concede el derecho de libre entrada y salida de otros estados; les asegura en otros estados la misma libertad de que disfrutan los ciudadanos de dichos estados en la adquisición y disfrute de bienes y en la consecución de la felicidad; y les asegura en los otros estados la igual protección de las leyes. Justicieramente se ha dicho que ninguna disposición de la Constitución ha operado tan marcadamente en hacer de los ciudadanos de los Estados Unidos un solo pueblo, como lo ha hecho ésta.' Y en *Ward* v. *Maryland,* 12 Wall. 418, que declaró nula una contribución estatal discriminatoria sobre los traficantes no resi-

dentes, la corte, por voz de su Juez Asociado Sr. Clifford, dijo (pág. 430): 'Fuera de toda duda estas palabras [privilegios e inmunidades] son palabras que encierran un significado muy amplio, pero basta decir que la cláusula sencilla e inequívocamente asegura y protege el derecho de un ciudadano de un estado a entrar en cualquier otro estado de la Unión con el propósito de dedicarse legalmente al comercio, a los negocios y a la industria sin inconveniente alguno; de adquirir bienes muebles; de comprar y retener bienes inmuebles; de litigar ante los tribunales del estado; *y de estar exentos de cualesquiera arbitrios o contribuciones mayores que los que se le imponen por el estado a sus propios ciudadanos.'*" (El primer corchete y las bastardillas son nuestros.)

En los casos de *Fiddler* y de *Ahumada* este Tribunal llegó a la misma conclusión. Véase el escolio 2. Cometimos error al decir en dichos casos que el artículo IV, sección 2, era aplicable a Puerto Rico. Pero cuando el Congreso adicionó una cláusula de privilegios e inmunidades al artículo 2 de la Carta Orgánica, el razonamiento en los casos de *Fiddler* y de *Ahumada* con respecto a la cláusula de privilegios e inmunidades recobró su validez en tanto en cuanto se aplica a ingresos recibidos o devengados después del 5 de agosto de 1947. *Smith* v. *Loughman*, 157 N. E. 753 (N. Y., 1927), que trataba de una contribución de herencia, es al mismo efecto. Y *State* v. *Berntsen*, 200 P.2d 1007 (Idaho, 1948), resuelve que una ley estatal de contribuciones sobre ingresos confiriéndole a los residentes de Idaho un crédito sobre ingreso neto de $1,500 en el caso de marido y mujer y de $200 para cada dependiente, y confiriéndole a los no residentes en las mismas circunstancias un crédito de sólo $700, es nula porque infringe la cláusula de privilegios e inmunidades de la Constitución Federal. Véanse *Recent Statutes*, 53 Harv.L.Rev. 1214; *Notes*, 20 Col.L.Rev. 457, por T. R. P. (aparentemente Thomas Reed Powell).

Dos casos recientes de la Corte Suprema arrojan mucha luz sobre este problema. En *Toomer* v. *Witsell*, 334 U. S. 385, se resolvió que un estatuto de Carolina del Sur que re-

quería a los no residentes el pago de un derecho de licencia de $2,500 por cada bote de camarones y requería a los residentes el pago de un derecho de licencia de sólo $25, violaba la cláusula de privilegios e inmunidades del artículo IV, sección 2, de la Constitución Federal. La Corte dijo a las págs. 395–6:

"El fin primordial de esta cláusula, como· el de las cláusulas que la rodean—aquéllas referentes a entera fe y crédito y a la extradición interestatal de fugitivos de la justicia—fué el ayudar a fundir en una sola Nación un número de estados, independientes y soberanos. Fué diseñada para asegurarle a un ciudadano del Estado A, que se aventura a entrar en el Estado B, los mismos privilegios de que disfrutan los ciudadanos del Estado B. Para la protección de esta igualdad el ciudadano del Estado A no sería restringido a los inciertos remedios concedidos por procesos diplomáticos ni a las represalias oficiales.

"Igual que muchas otras disposiciones constitucionales, la cláusula de privilegios e inmunidades no es absoluta. Impide el discrimen contra ciudadanos de otros estados cuando no existe motivo sustancial alguno para tal discrimen fuera del hecho escueto de que son ciudadanos de otros estados. Pero no prohibe la diferencia en trato en las muchas situaciones cuando existen motivos independientes perfectamente válidos para ello. De suerte que la investigación en cada caso debe ser en torno a si tales motivos existen en realidad y si el grado de discrimen tiene íntima relación con ellos. La investigación debe también practicarse, desde luego, teniendo en cuenta el principio de que los estados deben tener considerable libertad de acción para analizar los males locales y para procurarles el remedio adecuado."

La Corte añade a la pág. 398 que el propósito de la cláusula de privilegios e inmunidades "es erradicar las clasificaciones basadas en el hecho de la no ciudadanía, a menos que haya algo que indique que los no ciudadanos constituyen una fuente peculiar del mal que se trata de remediar con el estatuto." Sigue diciendo la Corte a las págs. 398–9 que *el estado puede* "restringir el tipo de equipo usado en las pesqueras, imponer derechos progresivos de licencias de acuerdo con el tamaño de los botes, o aun *cobrarle a los no residentes un diferencial que meramente compensaría al estado por cualesquier gastos adi-*

*cionales incurridos para hacer cumplir la ley que ellos puedan ocasionar* o para gastos de conservación de las contribuciones que sólo los residentes pagan. . . ." (Bastardillas nuestras.) (⁵)

El Juez Asociado Sr. Frankfurter, a quien se unió el Juez Asociado Sr. Jackson, concurrió en cuanto a los otros aspectos de la opinión de la corte en el caso de *Toomer*, pero no estuvo conforme con la opinión de la mayoría con respecto a la cláusula de privilegios e inmunidades. Sin embargo, aun él manifiesta en su opinión concurrente a la pág. 408 que "Creo que es correcto sintetizar las decisiones que han aplicado el artículo IV, sección 2, diciendo que las mismas prohiben a un estado penalizar a los ciudadanos de otros estados imponiendo a éstos contribuciones más altas meramente porque sean tales ciudadanos, o discriminando contra ciudadanos de otros estados en la lucha común por la vida en competencia con ciudadanos locales."

En *Mullaney* v. *Anderson*, 342 U. S. 415, la Corte resolvió que un estatuto de Alaska, que disponía licencias para los pescadores comerciales en aguas territoriales, e imponía un derecho de licencia de $5 a los residentes y uno de $50 a los no residentes, menoscababa la cláusula de privilegios e inmunidades del artículo IV, sección 2, de la Constitución Federal. En este caso, la opinión fué escrita por el Juez Asociado Sr. Frankfurter, diciendo a las págs. 417-9:

"En *Toomer* v. *Witsell*, 334 U. S. 385, la Corte resolvió que la sección 2 del artículo IV de la Constitución prohibiría a cualquier estado de imponer el derecho de licencia aquí impugnado. En dicho caso se dijo: *'El estado no carece de poder*, por ejemplo, para restringir el tipo de equipo usado en las pesqueras, imponer derechos progresivos de licencias de acuerdo con el tamaño de

<hr>

(⁵) Es importante indicar que en el caso de *Toomer*, resuelto en 1948, la Corte Suprema en tres sitios cita con aprobación el caso de *Travis* v. *Yale & Towne Mfg. Co.*, supra, el cual es muy similar al de autos. El Secretario de Hacienda arguye que el caso de *Travis* debe limitarse a sus hechos que trataban de ciudadanos de estados *colindantes*. El lenguaje del caso de *Travis* y decisiones posteriores de la Corte Suprema no dejan base para tan limitada interpretación de dicho caso.

los botes, o aun *para cobrarle a los no residentes un diferencial que meramente compensaría al estado por cualesquier gastos adicionales incurridos para hacer cumplir la ley que ellos puedan ocasionar en el cobro del derecho* o para gastos de conservación de las contribuciones que sólo los residentes pagan.' *Id.,* a las págs. 398–399. El discrimen que aquí se impugna no cae dentro de ninguna de estas excepciones. El Colector descansó en el costo más alto de hacer cumplir la ley imponiendo el derecho por los pescadores no residentes, a fin de justificar la diferencia en el derecho a cobrar, y la Corte de Distrito resolvió que el 90 por ciento del costo del cumplimiento fué invertido en cobrarle el referido derecho a los no residentes. Pero nada justifica la suposición de que el diferencial en el derecho tiene algo que ver con esta diferencia en el costo, nada que indique que 'meramente compensaría' por los gastos adicionales incurridos para hacer cumplir la ley. En verdad el Colector y su Ayudante encargado del cumplimiento específicamente negaron que conocieran cuánto costaba por dólar el hacer cumplir la ley. . . . *Las cuestiones constitucionales que afectan las contribuciones no giran sobre determinaciones matemáticas aun aproximadas. Pero se necesita algo más que la mera afirmación para que se establezca una relación razonable entre el derecho mayor y el costo más alto al territorio.* Ni siquiera remotamente insinuamos que el peso de la prueba para sostener la constitucionalidad de una contribución recae sobre la autoridad que la impone. Pero cuando la facultad de imponer contribuciones no es ilimitada, la validez no queda establecida por la mera imposición de una contribución. En este caso, los demandados negaron otras posibles bases para el discrimen levantadas por las alegaciones y aquélla en la cual descansa el Colector, costos más altos en el cumplimiento, era una cuyos hechos en su totalidad él tenía a mano. Los demandados intentaron averiguar estos hechos por medio de interrogatorios y en el contrainterrogatorio durante la vista, sin éxito alguno. Bajo las circunstancias, creemos que ellos cumplieron con su obligación al atacar el estatuto." (Bastardillas nuestras.) (⁶)

---

(⁶) En el caso de *Mullaney,* resuelto en 1952, la Corte Suprema revocó el caso de *Haavik* v. *Alaska Packers Assn.,* 263 U. S. 510, y resolvió que la cláusula de privilegios e inmunidades que se halla en la sección 2 del artículo IV de la Constitución de los Estados Unidos es aplicable a Alaska. En su discusión de este problema, la Corte llama la atención a la cuestión precisa ante nos. Dice a las págs. 419 a 420, escolio 2:

En el caso de *Pérez* rechazamos la contención de que tipos discriminatorios de contribuciones, como los aquí envueltos, están en pugna con la cláusula del debido procedimiento del artículo 2 de la Carta Orgánica. Dijimos a las págs. 362 a 364:

"Al enfocar el problema de determinar si la clasificación hecha por la Legislatura era arbitraria y caprichosa, debemos tener en cuenta que la cláusula del debido procedimiento ' "no tuvo por miras obligar al Estado a adoptar una regla inflexible de igual imposición de contribuciones" ' . . . y que 'la presunción de constitucionalidad sólo deja de existir cuando se demuestra hasta la saciedad que una clasificación constituye un discrimen hostil y opresivo contra clases o individuos particulares. Corresponde a aquél que ataca como inválida una pieza legislativa eliminar toda posible base que pueda apoyar su validez.' *Madden* v. *Kentucky,* 309 U. S. 83, 88; *Rivera* v. *Buscaglia,* 146 F.2d 461, 465 (C.C.A. 1, 1944). Véase *Porto Rico Telephone Co.* v. *Tribunal de Contribuciones,* [68 D.P.R.] pág. 154.

"Aquí no se ha cumplido con dicho deber. Por el contrario, sobre la cuestión de tipos contributivos más altos, como indicó la Corte de Circuito de Apelaciones en una situación algo similar en *South Porto Rico Sugar Co.* v. *Buscaglia,* [154 F.2d 96], pág. 100 el 'propósito de la clasificación muy bien pudiera servir para facilitar la administración de leyes contributivas.' Por ejemplo,

---

"En 1947, el Congreso enmendó la Carta Orgánica de Puerto Rico para que proveyera: 'Los derechos, privilegios e inmunidades de los ciudadanos de Estados Unidos serán respetados en Puerto Rico en la misma forma como si Puerto Rico fuere un Estado de la Unión y sujeto a las disposiciones del inciso 1 de la sección 2 del artículo IV de la Constitución de Estados Unidos'. 61 Stat. 772, 48 U.S.C. sec. 737. En sus manifestaciones explicando el proyecto, el Senador Butler, que lo propulsó, dijo, 'El Congreso no ha hecho extensiva expresamente la Constitución a Puerto Rico, como lo hizo en los casos de Alaska y Hawaii, y la Comisión consideró aconsejable traer a Puerto Rico expresamente dentro de la operación de la cláusula de reciprocidad de suerte que no quedaran dudas de que no habría discrimen en contra de los ciudadanos de Estados Unidos que no son residentes de Puerto Rico.' 93 Cong. Rec. 10402. El informe de la Comisión del Senado sobre Terrenos Públicos expresó su desagrado de que 'la legislación en Puerto Rico ha discriminado en contra de los ciudadanos americanos no residentes.' S. Rep. Núm. 422, Congreso 80, 1ra. sesión 4."

El inciso 1 de la sección 2 del artículo IV de la Constitución Federal dispone que "Los ciudadanos de cada estado disfrutarán de todos los privilegios e inmunidades de los ciudadanos de otros estados."

los gastos de cobro pueden ser mayores en cuanto a los no residentes; o puede ser difícil, si no imposible, traer a un no residente dentro de la jurisdicción de las cortes locales. 'Además . . . [un residente] tiene más probabilidades, mediante las contribuciones pagadas por [sus] empleados y mediante otras contribuciones [tales como arbitrios] . . . de contribuir más al mantenimiento del gobierno que protege las fuentes de donde obtiene [su] ingreso que' un no residente. *South Porto Rico Sugar Co.* v. *Buscaglia,* supra, pág. 101. (Corchetes nuestros.)

"Un pequeño contribuyente residente pagaba una contribución del 10 por ciento y tenía derecho a una exención personal y a créditos por dependientes; un contribuyente similar no residente pagaba una contribución del 28 por ciento sin la exención y sin los créditos. La diferencia en el importe de la contribución en las clasificaciones inferiores es considerable. Esta contribuyente específica viene obligada a pagar $1,121.67; si fuera residente pagaría $120.60. Pero al leerse la ley en su totalidad, es claro que ella y otros contribuyentes en situación similar no han sido objeto de un discrimen hostil y opresivo. Además de las posibles razones ya indicadas para esta clasificación, la Legislatura por motivos de conveniencia administrativa, puede haber tenido la intención de resolver el difícil problema de tributación al ingreso de individuos no residentes, procedente de fuentes dentro de Puerto Rico, imponiendo un tipo fijo de contribución en vez de los tipos progresivos que se aplican a los residentes.

"Indudablemente que los pequeños contribuyentes no residentes sufren hasta cierto punto con este método administrativo; por otro lado, con excepción de la negativa de la exención personal y los créditos por los dependientes, los contribuyentes no residentes que devengan ingreso neto mayor de $25,000 de fuentes dentro de Puerto Rico son de hecho favorecidos sobre los contribuyentes residentes que devengan ingresos netos mayores de $25,000. No podemos decir que el cuadro en conjunto demuestra un discrimen hostil y opresivo contra los no residentes, y que el contribuyente ha eliminado toda posible base que pudiera sostener la clasificación. Por el contrario, la Legislatura en el ejercicio de su discreción y a la luz de las consideraciones prácticas ha desarrollado, lo mismo que en el caso de los tipos progresivos para residentes, 'un método equitativo de distribuir las responsabilidades económicas del gobierno. . . .' . *N. Y. Ex rel. Cohn* v. *Graves,* 300 U. S. 308, 313.

"Resta ahora la cuestión sobre la exención personal y los créditos por dependientes. Toda vez que un no residente presumiblemente no incurre en gastos para su subsistencia en Puerto Rico, no es caprichoso negarle una exención personal. Esta misma razón se aplica a la negativa de los créditos por dependientes, con el factor adicional de que pudiera ser difícil, si no imposible, para el Tesorero cerciorarse de la veracidad de las planillas que reclamen créditos por dependientes no residentes."

Nos adherimos a los anteriores puntos de vista, según los expusimos en el caso de *Pérez*. En verdad, ahora venimos obligados a seguirlos debido al hecho de que la Corte de Apelaciones dijo en el caso de *Ahumada* que la misma está "sustancialmente de acuerdo con el criterio expresado" en el caso de *Pérez*. *Buscaglia* v. *Ahumada*, supra, pág. 776; véase el escolio 2 de esta opinión. Sin embargo, en el presente caso está envuelta no la cláusula del debido procedimiento o la de igual protección, sino la cláusula de privilegios e inmunidades, que no era parte de nuestra Carta Orgánica cuando surgió el caso de *Pérez*. Y la cláusula de privilegios e inmunidades establece una norma más precisa y más severa que la cláusula del debido procedimiento o la de igual protección. Véase *Anderson* v. *Mullaney*, 191 F.2d 123, 132-34 (C. A. 9, 1951), confirmado en *Mullaney* v. *Anderson*, supra. Es cierto, como se dijo en *Toomer* v. *Witsell*, supra, a la pág. 396, que la "cláusula de privilegios e inmunidades no es absoluta", y a la pág. 399 que a los no residentes se les puede imponer "un diferencial que meramente compensaría al estado por cualesquier gastos adicionales incurridos para hacer cumplir la ley . . ." Pero el caso de *Toomer* también indica que la cláusula de privilegios e inmunidades "impide el discrimen contra ciudadanos de otros estados cuando no existe motivo sustancial alguno para tal discrimen, fuera del hecho escueto de que son ciudadanos de otros estados." Y "se necesita algo más que la mera afirmación para que se establezca una relación razonable entre la [contribución] mayor y el costo más alto" del cobro de contribuciones sobre ingresos a los no residentes.

■■ Las partes estipularon que Antonio Laloma, Jr., Director del Negociado de Contribuciones sobre Ingresos del Departamento de Hacienda, de ser llamado como testigo, declararía como sigue:

"Que es Contador Público Autorizado y ocupa actualmente el cargo de Jefe del Negociado de Contribuciones sobre Ingresos del Departamento de Hacienda de Puerto Rico. Que ha ocupado este cargo por espacio de cinco años, habiendo sido anteriormente Subjefe de dicho Negociado y empleado de dicha dependencia por seis años.

"Que como tal Jefe, ahora, y Subjefe o empleado, antes, conoce los problemas con que se confronta el Gobierno de Puerto Rico en la imposición y cobro de las contribuciones sobre ingresos. Que varias de las medidas legislativas que se aprueban para afrontar esos problemas son propuestas originalmente por él al Tesorero de Puerto Rico, quien se encarga de gestionar su aprobación por la Legislatura.

"Que resulta impracticable y difícil al Gobierno de Puerto Rico cobrarle contribuciones a los no residentes a los mismos tipos progresivos, y concederle los mismos créditos y deducciones, que existen actualmente en Puerto Rico para los residentes. Que esto es así porque, para evitar la evasión del pago de las contribuciones por los no residentes, las mismas tienen que cobrarse por el procedimiento de la retención en el origen, ya que sería punto menos que imposible irles a cobrar a las distintas jurisdicciones de sus residencias.

"Que mediante el procedimiento de la retención en el origen se haría difícil computar la contribución normal concediendo los créditos y deducciones que se conceden actualmente a los residentes. Que sería igualmente difícil, y en muchos casos hasta imposible, computar la contribución adicional (*surtax*), concediendo dichos créditos y deducciones, y aplicando el tipo progresivo correspondiente. Que esto sería especialmente así en todos aquellos casos en que el no residente recibiera ingresos a través de dos o más agentes en Puerto Rico, lo cual requeriría la agrupación o suma de todos dichos ingresos para conceder una sola vez los créditos y deducciones permitidos por la ley, evitando la duplicidad o multiplicidad de concesiones a que no se tiene derecho, y para computar la contribución adicional (surtax) correcta a base del tipo correspondiente aplicable.

"Que uno de los motivos que se contemplaron para aprobar legislación imponiendo un tipo contributivo fijo, sin la concesión de ciertos créditos personales, a los no residentes, fué la dificultad e impracticabilidad—en muchos casos imposibilidad—anteriormente apuntadas, de cobrarle a los no residentes contribuciones sobre ingresos a los mismos tipos y en la misma forma que a los residentes."

En su testimonio el Sr. Laloma no hace esfuerzo alguno para cumplir con una de las normas establecidas en los casos de *Toomer* y *Mullaney* al efecto de que bajo la cláusula de privilegios e inmunidades, los tipos de contribuciones que discriminan en contra de los ciudadanos de un estado de la Unión están justificados si existe alguna relación razonable entre las contribuciones más altas y los costos mayores de cobrárselas a los no residentes. No ofrece cifras de clase alguna, generales o en detalle, para demostrar que las contribuciones considerablemente más altas impuestas a los no residentes con ingresos comparativamente modestos([7]) provenientes de fuentes en Puerto Rico, están justificadas por los costos del cobro de tales contribuciones. Por el contrario, su testimonio en sustancia es que la retención en el origen es un sistema necesario para el cobro de contribuciones sobre no residentes; que bajo el método de retener en el origen a un no residente no se le pueden conceder las mismas deducciones y créditos que a los residentes, porque obtendría tales deducciones y créditos más de una vez en aquellos casos en que reciba ingresos de dos o más fuentes en Puerto Rico; y que de igual forma,

---

([7]) El hecho de que una contribución fija del 29 por ciento sobre un no residente resulte en que éste pague menos contribuciones que un residente, en caso de que su ingreso tributable fuera mayor de $25,000, es un factor para demostrar que el debido procedimiento no fué violado, *Buscaglia, Tesorero v. Tribunal de Contribuciones, Isabel Pérez Vahamonde, Interventora*, supra, págs. 363-64. Pero, a los fines de la cláusula de privilegios e inmunidades, un discrimen ilegal contra algunos ciudadanos no residentes de otros estados no queda subsanado por el discrimen a favor de otro grupo de no residentes.

Notamos de paso que el importe del ingreso en que el tipo fijo del 29 por ciento viene a ser más favorable a los no residentes varía, dependiendo del año envuelto y del *status* personal del contribuyente.

la retención en el origen no colocaría a un no residente en la categoría adecuada a los fines del cobro de la contribución adicional, si recibiere ingresos de dos o más fuentes en Puerto Rico.

En muchos casos, sería difícil, si no imposible, cobrar contribuciones sobre ingresos a los no residentes en ausencia de una disposición para retener la contribución en el origen. Por consiguiente, una ley de contribuciones sobre ingresos puede válidamente disponer que las disposiciones sobre retención se apliquen exclusivamente a los no residentes. *Travis v. Yale & Towne Mfg. Co.*, supra, pág. 76. Por tanto no vemos objeción a la manifestación del Sr. Laloma al efecto de que la disposición sobre retención en el origen era un sistema necesario para el cobro de la contribución a los no residentes. (8)

Sin embargo, no podemos convenir en que el tipo fijo del 29 por ciento impuesto a los no residentes está igualmente justificado. El Sr. Laloma afirma que bajo el procedimiento de retención no se puede conceder deducciones y créditos a los no residentes porque éstos los obtendrían más de una vez cuando el no residente recibe ingresos de dos o más fuentes en Puerto Rico. Pero este problema aparentemente puede solucionarse proveyéndose que la contribución sobre no residentes se retendrá en el origen por los agentes retenedores a los tipos de contribución normal y adicional para residentes, sin deducciones o créditos de clase alguna, hasta que el contribuyente radique una planilla en alguna fecha posterior demostrativa de su ingreso total proveniente de todas las fuentes en Puerto Rico, y en la cual haga las mismas deducciones y créditos a

---

(8) El Sr. Laloma no dijo que el costo del cobro de la contribución es mayor bajo el método de retención que bajo el corriente; en verdad, se nos ocurre que, desde el punto de vista del gobierno, la retención puede ser más eficiente y menos costosa que el método ordinario. La Cámara de Representantes ha aprobado un proyecto de ley, que está pendiente ante el Senado, que adopta la retención como un método de cobrar contribuciones de ingresos sobre los sueldos pagados a los ciudadanos residentes. Sección 141 del P. de la C. núm. 935.

que los residentes tienen derecho. Cf. Sección 19 (f) de la Ley, según fué enmendada por la núm. 433 de 1947 ((1) pág. 889).[9] Una contribución ligeramente mayor para los no residentes bajo tal sistema sería válida si guardara una relación razonable con el costo adicional de operar el mismo.

El Sr. Laloma también manifestó que, una vez que se adopte el procedimiento de retención para los no residentes, es difícil, si no imposible, aplicar la contribución adicional progresiva a los no residentes que reciben ingresos de dos o más fuentes en Puerto Rico. Esto sí que presenta un problema sustancial. Sin embargo, el Sr. Laloma, el hombre con todos los "hechos . . . a mano",[10] no presentó cifra alguna con respecto a cuántas personas en el pasado han tenido más de una fuente de ingresos en Puerto Rico, los cuales, al sumarse todas, los elevaría a una categoría de contribución adicional. Pero suponiendo *argüendo* que el problema exista en un número sustancial de casos, no podemos ver por qué el sistema de exigir una planilla al no residente, conteniendo todos los hechos y calculando su contribución sobre la misma

---

[9] La sección 19 (f) dispone como sigue: "Un individuo no residente que no sea ciudadano de Puerto Rico recibirá el beneficio de las deducciones y créditos concedidos por este título solamente cuando rinda o haga rendir en la oficina del Tesorero una declaración verdadera y exacta de su ingreso total recibido de cualesquiera fuentes de Puerto Rico, en la forma prescrita por este título; incluyendo en dicha declaración toda la información que el Tesorero estime necesaria para determinar dichas deducciones y créditos. *Disponiéndose,* que se impondrá, cobrará y pagará por cada año contributivo sobre el ingreso neto (después de haberse concedido las deducciones fijadas en este título) recibido por un individuo no residente, que no sea ciudadano de Puerto Rico, de fuentes radicadas dentro de Puerto Rico, una contribución normal de veintinueve (29) por ciento de tal ingreso neto. *Disponiéndose, además,* que no se concederá exención o crédito personal alguno a los individuos no residentes que no sean ciudadanos de Puerto Rico, y que las deducciones admitidas a estos individuos no excederán del diez (10) por ciento de su ingreso bruto. . . ."

Como indicamos en el caso de *Pérez* a la pág. 355, escolio 4, el Tesorero aparentemente se ha allanado a la decisión del anterior Tribunal de Contribuciones en el caso de *Joglar* v. *Tesorero,* 1 D.T.C. 311, 321, al efecto de que la limitación del 10 por ciento sobre deducciones generales que se encuentra en la sección 19 (f) es nula.

[10] *Mullaney* v. *Anderson,* supra, págs. 418–19.

base de contribución normal y adicional que el residente, no sería factible en casi todos los casos. Un no residente que dejare de radicar su planilla o de pagar la contribución adicional correspondiente, podría ser alcanzado eficazmente a través de su ingreso de fuentes en Puerto Rico en años siguientes. Reconocemos que esto no sería posible en el caso de un no residente que no recibiera ingresos en un año posterior provenientes de fuentes en Puerto Rico. Nuevamente, las cifras con respecto a cuán frecuentemente ha ocurrido esta última situación, están en manos del gobierno, pero no en los autos. Para hacer frente a esta contingencia, la retención del ingreso de todos los no residentes podría fijarse a un tipo mayor, con una disposición para reintegro cuando la próxima planilla del no residente demostrara que éste no estaba sujeto al pago de contribución adicional.([11]) Finalmente, los casos pendientes ahora ante nos parecen indicar que el problema de la contribución adicional es comparativamente raro. Aparentemente, en casi todos los casos, el ingreso de no residentes de fuentes en Puerto Rico es tan pequeño que si se les tributara sobre la misma base que a los residentes, aquéllos (1) no pagarían contribución alguna, (2) sólo pagarían la contribu-

---

([11]) El P. de la C. núm. 935, que actualmente está pendiente en el Senado, luego de haberlo aprobado la Cámara de Representantes, cambia la ley actual e impone contribuciones a los residentes de Puerto Rico y a los ciudadanos de Estados Unidos no residentes sobre la misma base, a los fines de los tipos de la contribución, de las exenciones personales y de los créditos para los dependientes. Presumiblemente los problemas suscitados por el Sr. Laloma han sido sustancialmente resueltos mediante disposiciones sobre retención y sobre planillas diferidas. Véanse las secciones 11, 12, 25, 116, 119, 131, 141, 143, 211, 212, 213 y 411(a) 19 del P. de la C. núm. 935. El 18 de enero de 1953 apareció publicada en el New York Herald Tribune una carta protestando contra las disposiciones de nuestra Ley que imponían una contribución del 29 por ciento sobre dividendos e intereses pagados a no residentes. El Secretario de Hacienda escribió una carta, con fecha 18 de febrero de 1953, contestando la primera, la cual apareció en el mismo periódico el 27 de febrero de 1953. La carta del Secretario decía en parte que " . . . actualmente la Asamblea Legislativa de Puerto Rico tiene bajo su consideración un proyecto de ley que reduce la contribución sobre tales pagos al mismo tipo pagado por los residentes de Puerto Rico. El tipo provisto en el proyecto es de un 7 por ciento como contribución normal y una contribución adicional que empieza en un 5 por ciento."

ción normal, o (3) pagarían una pequeña contribución adicional. Lo que la Asamblea Legislativa realmente trató de hacer fué tributar aquellos ingresos pequeños en 29 por ciento, aun cuando al así hacerlo le confirió una ventaja al presumiblemente raro contribuyente no residente cuyo ingreso exceda de $25,000 anuales. Esto no lo puede hacer bajo la cláusula de privilegios e inmunidades.

Hemos discutido las soluciones posibles de los problemas de deducciones, créditos y contribuciones adicionales de no residentes con el fin de demostrar que pueden existir medios de resolver las dificultades apuntadas por el Sr. Laloma. Estas alegadas dificultades no parecen haber perturbado a los miembros de la Cámara de Representantes cuando ésta aprobó el P. de la C. núm. 935, ahora pendiente en el Senado. Véase el escolio 11. De cualquier modo, aun cuando las soluciones aquí propuestas fueran impracticables o difíciles, la Asamblea Legislativa no está por ello justificada en imponerle a los no residentes un tipo mayor de contribuciones que a los residentes. La teoría de los casos de *Toomer*, *Mullaney* y *Travis* es que en el contexto de este caso la justificación principal para la tributación a no residentes a un tipo mayor que el de los residentes es el costo más alto de cobrarle la contribución a los no residentes. Pero el severo mandato de la cláusula de privilegios e inmunidades no se rinde a la "mera afirmación" hecha por el Sr. Laloma de que es difícil o imposible proveer para una exacta retención cuando el ingreso de los no residentes proviene de más de una fuente en Puerto Rico. Toda vez que estamos convencidos de que el tipo fijo del 29 por ciento sobre todos los no residentes no tiene relación razonable a la cuestión del costo mayor del cobro de la contribución a los no residentes, y no surgiendo de los autos ninguna otra razón válida para ello, estamos constreñidos a resolver que, en tanto en cuanto la Ley de Contribuciones sobre Ingresos impone contribución a ciudadanos no residentes de un estado de la Unión a un tipo más alto que el impuesto a los residentes y les niega a aquéllos las exenciones personales y los créditos

por dependientes que le concede a los residentes, dicha ley menoscaba la cláusula de privilegios e inmunidades del artículo 2 de la Carta Orgánica.

Existe un punto procesal que requiere nuestra atención. El demandante ha radicado una moción en la que solicita que tomemos en consideración el testimonio del Sr. Laloma ante el Tribunal Superior en el caso de *Leticia Besosa Quiñones* v. *Secretario de Hacienda*, Caso Núm. I-155. Adherido a dicha moción se encuentra el testimonio del Sr. Laloma en el caso de *Besosa* según lo certifica el taquígrafo–repórter. En dicho caso el Sr. Laloma declaró en la silla testifical como testigo de la demandante que cuando él hizo las manifestaciones contenidas en la estipulación del caso de *Postley*, "trataba de justificar, no el tipo, sino el método de cobrar la contribución." Entonces declaró lo siguiente: "P.—¿Entonces sus razones van dirigidas exclusivamente al método de cobrar las contricuciones? R.—Creo que sí. P.—¿Podría usted ilustrar al Tribunal, si tiene conocimiento, por qué se fijó ese tipo del 29 por ciento? R.—Ése es un tipo arbitrario. P.—¿Entonces debo concluir de su contestación, que siendo ése un tipo arbitrario, usted no sabe si ese tipo guarda relación con las dificultades del cobro de esas contribuciones? R.—Creo que no guarda ninguna relación. El tipo podría ser 50 por ciento o 36 por ciento . . ."

En el contrainterrogatorio a que lo sometió el abogado del Secretario de Hacienda, el testigo declaró que el tipo de 29 por ciento no fué establecido debido a las dificultades en el cobro. Cuando se le preguntó por qué había sido así fijado, contestó: "Creo que es un tipo arbitrario; pudo haber sido el 27, el 28 o el 30 por ciento." Cuando se le preguntó nuevamente si la dificultad en el cobro a los no residentes tenía algo que ver con la diferencia entre los dos tipos, replicó que "No tiene que ver nada." Entonces se le preguntó: "¿En un caso como éste que la contribuyente tuvo ingresos netos por la suma de $3,000 y pico, de ingresos tributables . . . En un caso como éste, que ella, como no residente ha tenido que pagar más que

lo que hubiera tenido que pagar si se le hubiera considerado como residente, las dificultades del cobro, la dificultad de la verificación de los créditos además de las deducciones, etc., tiene que ver algo con la diferenciación de tipo? R.—No tiene que ver nada."

El Secretario de Hacienda se opone a que consideremos el testimonio del Sr. Laloma en el caso de *Besosa* por el fundamento de que éste fué presentado en otro caso después de haber el Tribunal Superior resuelto el caso de autos. Afirma que los casos citados por el demandante en apoyo de su moción no son aplicables. Es innecesario resolver esta moción. Suponemos, sin decidirlo, que no podemos considerar en este caso el testimonio del Sr. Laloma prestado en el caso de *Besosa.* Sin embargo, aun sin este testimonio ya hemos llegado a la conclusión de que las disposiciones sobre retención de la Ley propiamente dichas, son válidas como un método para cobrar aun cuando las mismas son aplicables exclusivamente a los no residentes; pero el hecho de que la retención es necesaria para cobrarle contribuciones a los no residentes, no justifica un tipo arbitrario que en las categorías más bajas es considerablemente mayor para un ciudadano no residente de un estado de la Unión que para un residente, en ausencia de (1) prueba que tienda a demostrar una relación razonable entre el tipo más alto y los costos del cobro, y (2) cualquier otra razón válida para tales tipos contributivos más altos. La dificultad apuntada por el Sr. Laloma en su testimonio estipulado en el presente caso—el problema de conceder deducciones y créditos a un no residente y colocarlo en la categoría adecuada cuando éste tiene dos o más fuentes de ingreso en Puerto Rico—nada tiene que ver con gastos adicionales en el cobro y debe resolverse en alguna otra forma que no sea la de fijar un tipo contributivo *arbitrariamente* mayor para *todos* los no residentes. [12]

---

[12] El Secretario de Hacienda no alega que aquí el resultado queda afectado por lo siguiente: (1) en Puerto Rico nuestra Ley de Contribuciones sobre Ingresos en la mayoría de las ocasiones sustituye a la Ley

Ya hemos visto que la cláusula de privilegios e inmunidades no es absoluta y que el costo más alto de cobro—así como otros motivos—puede bajo ciertas circunstancias justificar la imposición de contribuciones mayores para no residentes que para residentes. Pero en este caso no encontramos ni el costo más elevado en el cobro ni ninguna otra razón para ello. El tribunal sentenciador expuso dos razones, además del costo más elevado de cobro, que a su juicio justificaban la imposición a no residentes de contribuciones sobre ingresos más altas que a los residentes. No podemos estar de acuerdo con este criterio del tribunal sentenciador.

■ La primera razón adicional del tribunal sentenciador fueron los supuestos males del absentismo. No compete a nosotros decir si estos presuntos males existían antes o todavía existen. Suponemos, sin decidirlo, que existían para la fecha en que se aprobaron las secciones que aquí se impugnan, y que la Asamblea Legislativa impuso una contribución sobre ingresos más alta a los no residentes como uno de los medios empleados para erradicarlos. La mejor contestación a esta contención es que la cláusula de privilegios e inmunidades se interpone en el camino de una medida contributiva para tales fines. Así lo hace constar claramente el Juez Cardozo en *Smith* v. *Loughman,* supra, a la pág. 755:

"El estado no establece la validez de esta ley demostrando que desde ciertos puntos de vista o en ayuda de ciertos propósitos, una clasificación que discrimina entre residentes o no residentes, tiene una base, no enteramente ilusoria, en política o en el motivo. No es necesario investigar si tal demostración es suficiente si

---

Federal, mientras que en los Estados Unidos continentales, las leyes estatales complementan la Federal; (2) bajo ciertas circunstancias un no residente puede acreditar contra su contribución sobre ingresos federal toda o parte de la contribución sobre ingresos pagada por él bajo nuestra Ley. En su carta al New York Herald Tribune el Secretario llamó la atención hacia este segundo punto, véase el escolio 11. En su carta dijo el Secretario que ". . . más inversionistas [no residentes] estarían pagando una contribución federal más alta por dicho ingreso [dividendos e intereses obtenidos por individuos no residentes de fuentes en Puerto Rico] y podrían deducir de su contribución federal el importe pagado al Gobierno del Estado Libre Asociado de Puerto Rico . . ." (Corchetes nuestros.)

estuviéramos tratando con la cláusula de igual protección de la Enmienda XIV, y nada más. Como cuestión de hecho, estamos tratando con algo más. 'El poder de un estado de hacer clasificaciones razonables y naturales a los fines de la imposición de contribuciones, es claro e incuestionable; pero ni bajo la forma de clasificación ni bajo ninguna otra forma puede ningún estado hacer cumplir leyes contributivas las cuales en su funcionamiento práctico materialmente menoscaben o infrinjan la igualdad de privilegios comerciales garantizados por la Constitución federal, a los ciudadanos de los diversos estados.' *Chalker* v. *Birmingham & N. W. Ry Co.*, 249 U. S. 522, 526, 39 S. Ct. 366, 367 (63 L. ed. 748). La clasificación puede ser apoyada por muchas consideraciones de conveniencia o de razonabilidad y, eso no obstante, puede resultar ilegal si niega a los ciudadanos de cualquier estado los privilegios e inmunidades que pertenecen a los ciudadanos de otro. Dicho en otras palabras, la igualdad en tales circunstancias es de por sí la política de más alto grado, ante la cual deben inclinarse las demás políticas. Así lo manda la Constitución. Muy pocos de sus mandatos, de haber alguno, han tenido una influencia más marcada en el logro y conservación de la unidad de la Nación. *Paul* v. *Virginia,* 8 Wall, 168, 180, 19 L. ed. 357; *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 79, 40 S. Ct. 228, 64 L. ed. 460. *Cf. Hanover Fire Ins. Co.* v. *Carr*, 272 U. S. 494, 47 S. Ct. 179, 71 L. ed."

Podría añadirse que afirmar que el absentismo es uno de los males que justifica la imposición discriminatoria de contribuciones a pesar de la cláusula de privilegios e inmunidades, es una contradicción en sus términos. Es decir, el absentismo es inseparable, más bien que independiente, del hecho de no residir en Puerto Rico. Por tanto dicha no residencia no puede ser la base para el discrimen, cuando eso es exactamente lo que protege la cláusula de privilegios e inmunidades.

El otro motivo aducido por el tribunal sentenciador para sostener la contribución cae en la misma categoría. La corte dijo que contrario al no residente, el residente "normalmente reinvierte aquí esos beneficios porque aquí vive y paga al erario público otras contribuciones directas e indirectas, y en-

riquece nuestra economía." También hizo referencia la corte hacia los servicios públicos suministrados por el estado que protege la propiedad y los instrumentos de la producción de los no residentes. Una vez más, estos argumentos, no importa cuán plausibles sean, se enfrentan con el invencible obstáculo de la cláusula de privilegios e inmunidades, según lo indica la anterior cita del caso de *Smith* v. *Loughman*, supra. Los motivos de política aducidos por el tribunal sentenciador obviamente no colocan el discrimen en este caso dentro de la regla de que tal actuación es propia donde los "no ciudadanos constituyan una fuente peculiar del mal que se trata de remediar con el estatuto." *Toomer* v. *Witsell*, supra, pág. 398. Así resolverlo virtualmente invalidaría la cláusula de privilegios e inmunidades. ([13])

La cláusula de privilegios e inmunidades de la Carta Orgánica fué aprobada mientras el caso de *Pérez* estaba pendiente en este Tribunal y el de *Ahumada* estaba pendiente en la Corte de Apelaciones para el Primer Circuito. El informe de la Comisión sobre Terrenos Públicos del Senado manifiesta que la adición de la cláusula de privilegios e inmunidades de la Carta Orgánica ". . . hará que Puerto Rico esté sujeto al apartado 1 de la sección 2 del artículo 4 de la Constitución Federal, corrientemente conocida como la cláusula de reciprocidad. El propósito de esta adición es garantizar que los ciudadanos de los Estados que no residen en Puerto Rico recibirán el mismo trato en Puerto Rico que los residentes locales. Este derecho está garantizado por la Constitución a los ciudadanos de los varios estados, pero se ha re-

---

([13]) "Ni siquiera remotamente insinuamos que el peso de la prueba para sostener la constitucionalidad de una contribución recae sobre la autoridad que la impone. Pero cuando la facultad de imponer contribuciones no es ilimitada, la validez no queda establecida por la mera imposición de una contribución." *Mullaney* v. *Anderson*, supra, pág. 418. Igual que en el caso de *Mullaney*, por los motivos ya expuestos, estamos satisfechos del récord ante nos y de los términos de la Ley, de que el demandante ha cumplido con su obligación de demostrar que las secciones en cuestión infringen la cláusula de privilegios e inmunidades de la Carta Orgánica. Véase *Walker* v. *Tribl. Contribuciones y Tesorero*, 72 D.P.R. 698.

suelto que no es aplicable a Puerto Rico. La legislación en Puerto Rico ha discriminado en contra de los ciudadanos americanos no residentes." Véase el escolio 6 para una cita parcial de este informe en el caso de *Mullaney*.

No tenemos conocimiento de ninguna otra ley a que pudiera estarse refiriendo la Comisión excepto las secciones de la Ley de Contribuciones sobre Ingresos aquí envueltas. Creemos que es claro, fuera de toda duda, que la Ley del Congreso fué dirigida a estas secciones de nuestra Ley. La Comisión y el Senador Butler no dijeron que la imposición discriminatoria de contribuciones sería válida si se hallaba que ésta era necesaria para evitar el indebido absentismo o cualesquiera otros supuestos males sociales. En efecto dijeron que el actual discrimen en nuestra Ley de Contribuciones sobre Ingresos no podía ya continuar una vez que la cláusula de privilegios e inmunidades fuera incluída en la Carta Orgánica.

En términos generales, las leyes federales de contribuciones sobre ingresos no se aplican a Puerto Rico. En éste y en otros campos contributivos Puerto Rico disfrutaba, a virtud de la Carta Orgánica y disfruta ahora a virtud del convenio con los Estados Unidos, de facultades contributivas más amplias que los estados de la Unión en compensación parcial por su falta de representación en el Congreso. *Rivera* v. *Buscaglia*, 146 F.2d 461 (C. A. 1, 1944); *Buscaglia* v. *Ballester*, 162 F.2d 805 (C. A. 1, 1947), revocando *Ballester Hnos.* v. *Tribunal de Contribuciones*, 66 D.P.R. 560.([14]) Sin embargo, esta facultad más amplia de imponer contribuciones no subsiste en lo que se refiere a la cláusula de privilegios e inmunidades. Esta cláusula rige en Puerto Rico en la misma forma que rige en los estados de la Unión, tanto bajo la Carta

---

([14]) No empece los amplios poderes de imponer contribuciones conferidos a la Asamblea Legislativa de Puerto Rico por el estatuto envuelto en *Buscaglia* v. *Ballester*, supra, el Congreso tuvo el cuidado de añadirle lo siguiente: "*Disponiéndose* que no habrá discrimen entre los artículos importados de los Estados Unidos o de países extranjeros y los artículos similares producidos o fabricados en Puerto Rico." 48 U.S.C. sec. 741(*a*).

Orgánica desde el 5 de agosto de 1947, como bajo el convenio entre Puerto Rico y los Estados Unidos. 64 Stat. 319; 66 Stat. 327. Estas secciones de la Ley de Contribuciones sobre Ingresos no pueden permanecer en vigor en su forma actual a la luz de la aplicación a Puerto Rico de la cláusula de privilegios e inmunidades y de los casos que interpretan el artículo IV, sección 2, inciso 1 de la Constitución de los Estados Unidos.

Resolvemos que las secciones 12, 13, 18 y 19 de la Ley de Contribuciones sobre Ingresos, en tanto en cuanto disponen (1) una contribución normal del 29 por ciento a los no residentes que son ciudadanos de un estado de la Unión frente a una contribución normal del 7 por ciento a los residentes, y (2) la negativa a dichos ciudadanos no residentes de exenciones personales de $800 y $2,000 y de créditos por dependientes de $400 concedidos a los residentes, estableciendo con ello tipos más altos de contribuciones para tales no residentes que para los residentes, infringen la cláusula de privilegios e inmunidades del artículo 2 de la Carta Orgánica. Estas secciones son por tanto nulas en lo que respecta su aplicación a ingresos recibidos o devengados después del 5 de agosto de 1947.[15]

El resultado a que hemos llegado no requiere que resolvamos que la contribución sobre ingresos a un no residente es

---

[15] Este caso no envuelve la cuestión de si la Ley del Congreso del 5 de agosto de 1947 tiene el mismo efecto en Puerto Rico que el que la cláusula de privilegios e inmunidades de la sección 1 de la Enmienda XIV tiene sobre las facultades legislativas de los estados. Dicho problema podría presentarse solamente si surgiera un caso que envolviera a un ciudadano de los Estados Unidos que no sea ciudadano de un estado. Entonces tendríamos que determinar: (1) si la Ley del 5 de agosto de 1947 opera en la misma forma en Puerto Rico como la sección 1 de la Enmienda XIV opera para los estados; (2) suponiendo que la primera pregunta sea contestada en la afirmativa, si la sección 1 de la Enmienda XIV le otorga la misma protección en el problema ante nos como la que le otorga el inciso 1, sección 2, artículo IV, de la Constitución Federal. Compárense *Buscaglia, Tesorero* v. *Tribunal de Contribuciones. Isabel Pérez Vahamonde, Interventora*, supra, págs. 358-59 con *Buscaglia, Tes.* v. *Tribl. Contribu-*

enteramente nula y que no viene obligado a pagar contribución alguna. Por el contrario, como en el caso de un extranjero residente, nuestra decisión no invalida toda la contribución impuesta a un no residente. Éste tiene derecho solamente al mismo trato que los ciudadanos de Puerto Rico que residen aquí. Por tanto, su contribución debe calcularse al mismo tipo que la de los ciudadanos residentes. *Ballester* v. *Tribunal de Apelación*, 61 D.P.R. 474, 500, confirmado en *Ballester-Ripoll* v. *Court of Tax Appeals of P. R.*, 142 F.2d 11, 18– 9 (C. A. 1, 1944);[16] *San Juan Trading Co.* v. *Sancho*, 114 F.2d 969, 975 (C. A. 1, 1940); *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96, 99 (C. A. 1, 1946); *Anderson* v. *Mullaney*, supra, pág. 133, confirmado en *Mullaney* v. *Anderson*, supra. Contra, *State* v. *Berntsen*, supra, con el cual no estamos de acuerdo sobre este punto.

*La sentencia del Tribunal Superior será revocada y se dictará nueva sentencia instruyendo al Tribunal Superior que a su vez ordene al Secretario de Hacienda que reintegre al demandante aquella parte de las cantidades retenidas en el origen y pagadas a dicho Secretario en exceso del importe de la contribución que dicho demandante hubiera pagado de habérsele impuesto la contribución sobre la misma base que a un ciudadano residente de Puerto Rico.*

Los Jueces Asociados Sres. Negrón Fernández y Sifre no intervinieron.

---

ciones, *Antonio Ahumada Valdés, Interventor*, supra, pág. 981; *Madden* v. *Kentucky*, 309 U. S. 83, revocando *Colgate* v. *Harvey*, 296 U. S. 404; opinión disidente en *Colgate* v. *Harvey* a las págs. 443–450; *Hague* v. *C.I.O.*, 307 U. S. 496, 520, escolio 1; *Edwards* v. *California*, 314 U. S. 160, 177–186 (opiniones concurrentes); *Adamson.* v. *California*, 332 U. S. 46; McGovney, *Privileges or Immunities Clause, Fourteenth Amendment*, 4 Iowa L. Bull. 219, según aparece publicado en 2 *Selected Essays on Constitutional Law* 402; Howard, *The Privileges and Immunities of Federal Citizenship and Colgate* v. *Harvey*, 87 U. Pa. L. Rev. 262.

[16] No se entabló recurso de apelación contra nuestra decisión anulando la imposición de un tipo contributivo sobre el ingreso de extranjeros residentes más alto que el tipo contributivo sobre el ingreso de ciudadanos residentes. 61 D.P.R. 474, 495–500; 142 F.2d 11, 18.